S97P2069. BARNES v. THE STATE.
(496 SE2d 674)

SEARS, Justice.

Joseph Martin Barnes was convicted of malice murder, felony murder, and armed robbery.[1] The jury recommended a death sentence for the murder, finding as a statutory aggravating circumstance that the murder was committed during the commission of an armed robbery.[2] On appeal, we find that the trial court improperly restricted the scope of mitigating evidence presented to the jury in the sentencing phase and, therefore, we reverse the death sentence and remand for a new sentencing trial. We affirm Barnes' convictions.

Barnes, 22 years old at the time of the killing, claimed self-defense. The evidence showed that the victim was a 57-year-old man named Prentiss Wells. Mr. Wells was, according to Barnes, "elderly" and "mentally slow," and others testified that he was slightly disabled due to a previous stroke. Wells bought a flea market stall several months before his death, and he often purchased used items that he intended to later sell. He frequently carried a large amount of cash with him. Barnes and his co-defendant, Tim Brown, met Wells about a month before his death, and assisted him with errands on

---

[1] The crimes occurred on February 13, 1992, and Barnes was indicted by the Newton County Grand Jury on June 9, 1992, for malice murder, felony murder (2 counts), and armed robbery. The state announced its intention to seek the death penalty on June 1, 1992. Barnes was tried before a jury in June 1993, convicted on all counts, and sentenced to death for the murder on June 22, 1993. The trial court also imposed a consecutive life sentence for the armed robbery. Barnes filed a motion for new trial on July 13, 1993, and an amended motion for new trial on December 7, 1993. Barnes' amended motion for new trial was denied on July 31, 1996. The notice of appeal was filed with this Court on August 29, 1996, and this case was docketed on September 17, 1997.

[2] OCGA § 17-10-30 (b) (2).

several occasions. Barnes and Brown noticed the cash that Wells often carried, and they talked about robbing him. On February 12, 1992, they went to a pawn shop where Brown bought a shotgun and Barnes bought a Davis Industries .380 pistol.

The next day, Wells went with Barnes and Brown in Brown's pickup truck. The two men moved a piano for Wells and later took him to look at an old truck that he was thinking about buying. Wells had $5,800 in cash on him — Barnes and Brown saw it "hanging out of his pocket." When they were driving on a dirt road, Barnes, who was sitting in the middle of the front seat, told Wells, who was sitting to Barnes' right, that he wanted his money. Wells resisted and a physical altercation erupted. Brown stopped the truck, and Barnes and Wells exited the passenger side and continued fighting. Barnes testified that he was mostly warding off Wells' blows and only hitting back to make Wells stop. The medical examiner testified, however, that Wells had 12 impact blows on the left side of his head and face, several centered around a star or diamond shaped laceration possibly caused by a ring or a gun barrel. One of the lacerations penetrated all the way through the scalp to Wells' skull. Barnes testified that he was right handed and wore a ring on his right hand that was sharp. Barnes also conceded that after the fight he was not bleeding, had no visible injuries, and had cleaned Wells' blood off of the passenger window of Brown's truck.

Barnes testified that during the fight Wells reached into his pocket and Barnes, fearing that Wells had a gun, grabbed his gun (already loaded and ready to fire), and shot Wells. The medical examiner testified that Wells was shot twice in the left side of the torso. The crime scene analysis showed that Wells turned and staggered about 40 feet before collapsing face down. The medical examiner further testified that a third, fatal shot was a contact shot — Barnes had run up behind Wells, either when he was staggering or when he was lying face down, and pressed the barrel of the gun against the back of his head as he fired. It is not disputed that Wells was unarmed.

Barnes took the cash from Wells' body and returned to the pickup truck. He told Brown, who later testified that he had not seen the shots fired because he had "froze up," that "we're both involved in this." The two men drove to Brown's trailer, picked up Brown's wife, Tonya, and fled to North Carolina. Before they left Georgia, they stopped at a Red Lobster for dinner and at a pawn shop where Barnes bought a Bersa .380 pistol. They paid for the dinner and the gun with the cash Barnes had taken from Wells. Tonya Brown rented an apartment in North Carolina and the two men stayed there for almost a week until the police arrived and arrested Tim Brown. The murder weapon, the Davis Industries .380 licensed to Barnes, was

found in Brown's truck.

The police arrested Barnes in Young Harris, Georgia, where he had gone to visit a relative. He had the Bersa .380 pistol loaded and ready to fire in his coat pocket. In an interview with police, Barnes volunteered that he had shot Wells in self-defense. At trial he also stated that there was no specific plan to rob Wells, the money having been taken as an afterthought, but conceded that they had talked about robbing him before the day of the killing. Brown pled guilty to felony murder and testified for the state at Barnes' trial.

1. Viewed most favorably to the verdict, we determine that the evidence introduced at trial was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that Barnes was guilty of the crimes for which he was convicted.[3]

2. Barnes claims that the trial court erred by not transferring venue due to prejudicial pretrial publicity. A trial court must order a change of venue in a death penalty case when a defendant can make a "substantive showing of the likelihood of prejudice by reason of extensive publicity."[4] To justify a change of venue, a defendant must show that the trial setting was inherently prejudicial as a result of pretrial publicity or show actual bias on the part of individual jurors.[5]

In order to determine if the trial setting was inherently prejudicial, appellate courts will consider the size of the community, the extent of media coverage, and the nature of the media coverage, especially if the coverage was inaccurate or inflammatory.[6] Newton County, according to Barnes' brief, has a population of 41,080. There were only eight articles published in three separate local newspapers about the murder and the upcoming trial of Barnes. Three of the articles were published in February and March 1992, fifteen months before trial, and dealt with the fact that a murder had taken place, that the victim was a former minister, and that Barnes and Brown had been arrested for the crime. Two later articles were summary articles listing pending murder trials, and the Barnes trial was only one of several cases mentioned. Barnes complains the most about an article that appeared in the Covington News a week before trial where the DA said that the Barnes trial was a "serious case," that his office was seeking the death penalty, and that the co-defendant had pled guilty and would testify. The DA also said that Barnes was the "triggerman," and the article mentioned some previously reported details about the crime, such as the victim being a former minister.

---

[3] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).
[4] *Jones v. State*, 261 Ga. 665 (2) (b) (409 SE2d 642) (1991).
[5] *Jones v. State*, 267 Ga. 592 (1) (a) (481 SE2d 821) (1997).
[6] See *Chancey v. State*, 256 Ga. 415 (5) (349 SE2d 717) (1986).

The media coverage, eight articles in three different newspapers over a fifteen-month period, was not extensive. Nor was it inflammatory or inaccurate — in fact, much of the information, such as Barnes being the "triggerman," was conceded by Barnes at trial as part of his justification defense.[7] Since the publicity was not extensive nor reflective of an atmosphere of hostility,[8] we do not find that the trial setting was inherently prejudicial.

The individual voir dire responses do not show actual bias on the part of the jurors. In order to show actual juror bias, Barnes must demonstrate that a high percentage of jurors had actual knowledge or had formed opinions about the case based on what they had seen or heard, or that there was a relatively high excusal rate.[9] Approximately 2/3 of the venire had heard about the case, but individual voir dire revealed that most of these jurors could not remember details about the crime and that few had formed an opinion about Barnes' guilt. Only five out of seventy-four jurors (about seven percent) were excused for cause because they had formed a fixed opinion due to pretrial publicity.[10] The trial court did not err in denying Barnes' motion for a change of venue.

3. Barnes claims that the trial court erroneously denied his motion to suppress $600 in cash and a cartridge box seized from the bedroom that he had been using in Tonya Brown's apartment. The cartridge box and cash were not introduced into evidence at trial so this argument is moot.

4. Barnes complains that the state was unable to produce Tonya Brown's "consent to search" form and that any items seized pursuant to her consent should therefore be suppressed. As discussed in Division 3, the state never introduced into evidence the items seized from Barnes' bedroom so any argument with regard to these items is moot. The gun seized from Brown's pickup truck was introduced at trial, but Barnes had no reasonable expectation of privacy in his accomplice's truck and therefore lacks standing to challenge this search.[11]

5. Barnes claims that Judge Sorrells, the trial judge, was biased against him and the rest of the Barnes family. Before trial, Barnes

---

[7] Compare *Tyree v. State*, 262 Ga. 395 (1) (418 SE2d 16) (1992) (trial setting inherently prejudicial where numerous front page articles contained speculation about the crime having no basis in the facts, reported that the defendant was a repeat offender who had previously got off on a technicality, contained the Sheriff's opinion that the defendant had faked a suicide attempt so he could try to plead insanity, and quoted the DA as saying that he could personally kill the defendant with a gun but would instead use the legal system to do it).

[8] See id.

[9] *Jones*, 267 Ga. at (1) (a).

[10] See, e.g., *Tharpe v. State*, 262 Ga. 110 (5) (416 SE2d 78) (1992) (no error to deny motion for change of venue where less than 12 percent of venire was excused due to pretrial publicity).

[11] See *Rakas v. Illinois*, 439 U. S. 128, 134 (99 SC 421, 58 LE2d 387) (1978).

brought a motion to recuse Judge Sorrells. A recusal hearing was held, and the judge presiding over that hearing determined that the evidence would not cause a reasonable person to question the impartiality of Judge Sorrells.[12] We have examined the record, including the transcript of the recusal hearing, and conclude that this ruling was not error.

6. The state used seven of its ten peremptory strikes to remove African-Americans from the jury, Barnes objected under *Batson v. Kentucky*,[13] and the trial court ruled that the state had not exercised its strikes in a discriminatory manner. There were 16 African-Americans on the 54-juror panel from which the jury and alternate jurors were selected. The jury that convicted Barnes included six African-Americans. The trial court required the state to articulate its reasons for the peremptory strikes, rendering the preliminary showing of prima facie discrimination moot.[14]

Once a prima facie case of discrimination is made, the proponent of the strike is required to set forth a race-neutral, case-related, clear and reasonably specific explanation for the exercise of its strikes.[15] An explanation is not race-neutral if it is based on a characteristic that is peculiar to any race or on a stereotypical belief.[16] At this point, the proponent of the strike need not proffer an explanation that is persuasive or even plausible — all that is required is an explanation that is facially race-neutral.[17] The trial court must then determine, considering the totality of the circumstances, whether the opponent of the strikes has shown that the proponent was motivated by discriminatory intent in the exercise of his strikes.[18] The opponent of the strikes may carry his burden of persuasion by showing that similarly situated jurors of another race were not struck or that the proponent's race-neutral reason for a strike is "so implausible or fantastic that it renders the explanation pretextual."[19] A trial court's findings on whether the opponent of the strike has met his burden of persuasion is entitled to great deference and will be affirmed unless clearly erroneous.[20]

The state sometimes gave more than one reason for the strike of a juror. Five of the seven African-American jurors were struck because they were hesitant about imposing the death penalty, had

---

[12] See Code of Judicial Conduct, Canon 3E.
[13] 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).
[14] *Hernandez v. New York*, 500 U. S. 352, 359 (111 SC 1859, 114 LE2d 395) (1991).
[15] *Turner v. State*, 267 Ga. 149 (2) (476 SE2d 252) (1996).
[16] Id.
[17] *Purkett v. Elem*, 514 U. S. 765 (115 SC 1769, 131 LE2d 834) (1995).
[18] *Turner*, supra.
[19] Id.
[20] Id.

been prosecuted by the DA's office, had family members who had criminal records, or had previously sat on a jury that had returned a not guilty verdict in a felony case. These are all valid race-neutral reasons that are adequate to justify a peremptory strike.[21] Barnes points to a white juror who was not struck and had a son who had been previously prosecuted by the DA's office, but this juror was not similarly situated with the African-American jurors who were struck. Five years before Barnes' trial, the white juror's son pled guilty as a first offender to criminal trespass and received twelve months probation. The African-American jurors who were struck due to criminal records had either been themselves prosecuted by the DA's office, had a relative currently facing prosecution, or had a son who had recently been convicted of "various charges" or a felony.

One of the reasons given for the strike of the sixth African-American juror was that his young son had been taken to the hospital after accidentally swallowing phenobarbital, but the juror had decided to remain at the courthouse for voir dire. The state thought that this behavior was irrational, and we do not conclude that the trial court's acceptance of this reason was clearly erroneous. The proffered reason was not based on a stereotypical belief or a characteristic peculiar to any race and, "[u]nless a discriminatory intent is inherent in the . . . proponent's explanation, the reason offered will be deemed race neutral."[22] This reason is also not so implausible or fantastic that it renders the explanation pretextual.[23]

Two reasons were given for the strike of the seventh African-American juror: 1) a deputy told the prosecutor that he had been recently called to the juror's house on a domestic disturbance and the juror had been "part of the problem," and 2) the juror was hesitant about the death penalty. We do not find that the trial court erred by accepting the state's first reason for the strike because there was no discriminatory intent inherent in the state's explanation.[24] Further, the state may rely on information and advice provided by others so long as this input is not predicated upon the race of the prospective juror.[25] Although support for the state's second reason for striking this juror is not readily apparent from the trial transcript, considering the totality of the circumstances, including the racial composition of the trial jury and the existence of other valid race-neutral reasons

---

[21] See *Tharpe v. State*, 262 Ga. at (6); *Davis v. State*, 263 Ga. 5 (10) (426 SE2d 844) (1993); *Crawford v. State*, 220 Ga. App. 786 (1) (470 SE2d 323) (1996).

[22] *Jackson v. State*, 265 Ga. 897 (2) (463 SE2d 699) (1995), quoting *Hernandez*, supra at 358-359.

[23] See *Purkett*, supra.

[24] See *Jackson*, supra.

[25] See *Lewis v. State*, 262 Ga. 679 (2) (424 SE2d 626) (1993); *Congdon v. State*, 262 Ga. 683, 684 (424 SE2d 630) (1993).

for this strike and the other strikes by the state, we cannot conclude that the trial court's *Batson* ruling was clearly erroneous.[26]

7. Barnes complains that the trial court failed to excuse for cause six prospective jurors due to pretrial publicity. " 'In order to disqualify a juror for cause, it must be established that the juror's opinion was so fixed and definite that it would not be changed by the evidence or the charge of the court upon the evidence.' "[27] The record shows that none of these six jurors had fixed opinions about Barnes' guilt or any other issue in the trial. We find no error.

8. Barnes claims that two prospective jurors, a corrections officer who was a former deputy and a fireman who was married to a police officer, should have been excused for cause due to their ties to law enforcement. Neither juror, however, was a sworn law officer with arrest power. Therefore, they were not subject to an excusal for cause on this basis.[28] We find no error.

9. The trial court did not err by excusing a juror for cause due to her inability to fairly consider a death sentence.[29] "The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment 'is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' "[30] The record shows that the juror clearly stated that she could never vote to impose a death sentence regardless of the evidence and the trial court's instructions. The trial court was authorized to strike this juror for cause.[31]

10. Barnes contends that the trial court improperly restricted the scope of voir dire by limiting his ability to ask follow-up questions about the death penalty, favorite television shows, the credibility of police officers, the effects of pretrial publicity and the victim's status as a former minister. The record reveals that Barnes often did not try to ask these follow-up questions and that, when he did try, the questions were either repeats of questions already asked or they called for the juror to prejudge the case. The scope of voir dire is largely left to the trial court's discretion, and the voir dire in this case was broad enough to ascertain the fairness and impartiality of the prospective

---

[26] Compare *Williams v. State*, 262 Ga. 732 (1) (426 SE2d 348) (1993) (reversible error where the state used 9/10 peremptory strikes on African-Americans and the voir dire transcript did not support the striking of six of these jurors due to hesitation about the death penalty).

[27] *Chancey*, supra at (3) (B) (a).

[28] *Mosher v. State*, 268 Ga. 555 (2) (491 SE2d 348) (1997); *Jordan v. State*, 247 Ga. 328 (6) (276 SE2d 224) (1981).

[29] *Witherspoon v. Illinois*, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968).

[30] *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997), quoting *Wainwright v. Witt*, 469 U. S. 412 (105 SC 844, 83 LE2d 841) (1985).

[31] *Greene*, supra.

jurors.[32] Furthermore, it is not error for the trial court to exclude voir dire questions that do not deal directly with the case at hand, such as questions regarding favorite television shows.[33] We find no error.

11. Barnes complains that the trial court moved the trial along too quickly, curtailing relevant voir dire and leaving defense counsel with inadequate time to plan his peremptory strikes and prepare for his change of venue motion. We disagree because this contention is unsupported by the record. The record shows that the trial court urged the parties to be brief but as complete as possible.

12. Barnes asserts that the state improperly commented on his pre-arrest silence in violation of *Mallory v. State*.[34] Specifically, Barnes complains that the prosecutor cross-examined Barnes about his failure to seek help after Barnes allegedly killed Wells in self-defense. The prosecutor inquired of Barnes why he had not flagged down a passing motorist or gone to the police. The state also argued this omission by Barnes in his closing argument.

In *Mallory*, the defendant was convicted of murder. The state introduced a portion of the defendant's statement that included a question about why the defendant, upon learning that he was under investigation by the police for the murder, had not come forward to explain his innocence.[35] We held on appeal that Georgia law prohibits the state from commenting on a defendant's silence before his arrest or his failure to come forward because such a comment is far more prejudicial than probative.[36] This rule applies even where the defendant has not received *Miranda*[37] warnings and where he takes the stand in his own defense.[38]

The trial court therefore erred by allowing the state to cross-examine Barnes about his failure to talk to the police before his arrest. The weight of the evidence, though, renders this error harmless. The evidence adduced at trial showed that Barnes, although claiming self-defense, fired the fatal shot point-blank into the back of the unarmed victim's head during the course of an armed robbery. Barnes then fled the jurisdiction and hid in another state. Considering the amount of evidence available to refute Barnes' claim of self-defense, we do not find reversible error due to the *Mallory* violation.

13. Barnes claims that the state improperly commented in its opening statement on an admission by Barnes to the police that had been suppressed due to *Miranda* violations. The state referred to

[32] See *Hall v. State*, 259 Ga. 412 (1) (383 SE2d 128) (1989).
[33] See *Spivey v. State*, 253 Ga. 187 (6) (a) (319 SE2d 420) (1984).
[34] 261 Ga. 625 (5) (409 SE2d 839) (1991).
[35] Id.
[36] Id.
[37] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).
[38] *Mallory*, supra.

Barnes' admission during a police interview that he had shot the victim. Barnes also complains that the two police officers who interviewed Barnes improperly testified about the suppressed admission by Barnes that he had shot Wells.

This argument is unsupported by the record. In effect, Barnes made three statements to the police and only the third statement was suppressed. The first statement occurred when Barnes blurted to the police officers, before any questioning had occurred, that "Tim didn't have anything to do with shooting the old man, I did." The police then stopped Barnes, read him his *Miranda* rights, and Barnes made a second statement about shooting the victim. The police, sensing that Barnes wanted to confess further, turned on a tape recorder and Barnes made a third statement but also requested an attorney. The trial court ruled that the third, tape-recorded statement was inadmissible due to a *Miranda* violation, but that the previous two statements were admissible. The record shows that neither the prosecutor nor the two police witnesses referred to the inadmissible third statement. Even assuming that the state had referred to the third statement, any error would be harmless because the admission by Barnes that he had shot Wells was conceded by Barnes at trial and was the basis of his defense. We find no error.

14. Barnes contends that the trial court erred by excluding evidence about a prior violent act by the victim. Specifically, Barnes claims that Tim Brown, Barnes' accomplice, would have testified about an incident where he accompanied the victim to a trailer park and the victim threatened a third party with a gun. Brown allegedly told Barnes about this incident before the day of the victim's killing. Barnes claims that the failure of the trial court to allow this testimony undermined his ability to convince the jury that he reasonably believed that the victim was armed and about to draw his weapon.[39]

Barnes, however, failed to notify the state before trial that he planned to introduce evidence about a past violent act by the victim against a third party, as required by *Chandler v. State.*[40] Since prior notice was not provided to the state, the admission of this testimony would have been fundamentally unfair and the trial court did not err by excluding it.[41] Furthermore, Barnes did not make an offer of proof as to the expected testimony of Brown regarding this incident. Without a record as to what Brown would have testified, Barnes' argument is based only on speculation. We find no error.

15. On direct examination, Tim Brown, Barnes' accomplice, stated that his current address was a Georgia prison. The state then

---

[39] Brown was permitted to testify that he had seen the victim previously carry a gun.
[40] 261 Ga. 402 (3) (405 SE2d 669) (1991).
[41] Id.

elicited that Brown had pled guilty to felony murder for the killing of the victim and had been sentenced to life. Barnes argues that the admission of Brown's guilty plea was so prejudicial under the facts of this case that it amounted to error — since Barnes was the admitted "triggerman" it was tantamount to endorsing a guilty verdict for Barnes. Barnes further complains that the state used the evidence of Brown's life sentence in the sentencing phase to argue that the jury should compare the sentences of the two men and find that the more culpable Barnes should receive death. At the start of the trial, the trial court denied Barnes' motion in limine to keep out any evidence of Brown's plea and sentence.

Under OCGA § 24-3-52, a non-testifying co-indictee's guilty plea is inadmissible at trial under the theory that it is not competent proof of the defendant's guilt.[42] OCGA § 24-3-52, however, is inapplicable where, as in this case, the accomplice takes the stand and is subject to cross-examination.[43] The accomplice's guilty plea may be used for a limited evidentiary purpose, such as to reflect on the witness' credibility.[44] Although Barnes complains that the jury would not realize that the accomplice traded his chance of acquittal for the state not seeking the death penalty, Barnes had the opportunity to cross-examine Brown as to his motives for pleading guilty and chose to forego this opportunity. In addition, while the trial court did not give a limiting instruction that the plea should only be used to determine the credibility of the witness and not as proof of the defendant's guilt, Barnes did not request a limiting instruction. "When evidence is admitted for one purpose, as it was in this case, it is not error for the court to fail to instruct the jury to limit its consideration to the one purpose for which it is admissible, *in the absence of a request to so instruct the jury*."[45] Under these circumstances, we find no error with regard to Barnes' conviction. We are troubled by the state's use of the co-defendant's life sentence in the penalty phase argument to urge the jury to return a death sentence for Barnes, but we need not consider whether this argument amounts to reversible error due to our reversal of the death sentence in Division 27.

16. The state objected to Barnes' closing argument in the guilt/innocence phase when the defense counsel stated: "[I]f Tim Brown had turned himself in he would never, if he had come and told the police, he would never have been charged with anything." The trial court sustained the objection because the defense was arguing facts

---

[42] OCGA § 24-3-52.

[43] *Cantrell v. State*, 201 Ga. App. 184 (410 SE2d 208) (1991).

[44] See *Foster v. State*, 178 Ga. App. 478 (1) (343 SE2d 745) (1986).

[45] (Emphasis in original.) *Head v. State*, 262 Ga. 795 (4) (426 SE2d 547) (1993), quoting *Harrell v. State*, 241 Ga. 181 (2) (243 SE2d 890) (1978).

not in evidence. The defense then continued, stating: "You've heard all the evidence. If you were sitting on the jury would you find Tim Brown guilty of murder? No." The state again objected and the trial court told the defense not to argue Tim Brown's guilt because "that case is over with, it's not being tried and it's not the same."

Barnes claims that he was improperly restricted from arguing a permissible inference, and that the trial court improperly expressed his opinion of the evidence. We disagree. Although the permissible scope of closing argument is broad, counsel must draw his inferences from evidence properly before the factfinder.[46] There was no evidence that the DA's office would not have charged Brown if he had come forward so this argument was not a permissible inference. In addition, Barnes agreed with the trial court's statement — that Tim Brown's case is over with and is not the same as Barnes' case — and told the trial court, "That's exactly my point and the only reason I raised it." We find no error. "A judge's remarks assigning a reason for a ruling are neither an improper expression of opinion nor a comment on the evidence."[47] This is especially true when the complaining party agrees with the remarks when they are made.

17. The trial court did not err by allowing a state witness to remain in the courtroom after the rule of sequestration had been invoked. Charles Roper, the state's chief investigator on the Barnes case, was also the prosecutor who had signed the indictment. It is a long-standing exception to the rule of sequestration that the prosecutor who signed the indictment charging the defendant may remain in the courtroom and testify after other state witnesses have testified.[48]

18. Barnes objected to a question that called for Investigator Roper to explain how a spent shell casing ejects from a semi-automatic pistol. Barnes stated that Roper was not qualified as an expert on this matter. As a foundation, the state elicited that Roper had been with the Newton County Sheriff's Department for twelve years, that he had carried a semi-automatic pistol for four or five years, that he fires his pistol four times a year, and that Roper's pistol operates on basically the same principle as the murder weapon. An expert may derive his knowledge from personal experience — formal education is not required.[49] The trial court allowed Roper to testify about the simple matter of how a shell would eject from a semi-automatic pistol, and this judgment will not be disturbed absent an abuse of discretion.[50] We find no error.

---

[46] See *Morgan v. State*, 267 Ga. 203 (3) (476 SE2d 747) (1996).
[47] *McClain v. State*, 267 Ga. 378 (3) (b) (2) (477 SE2d 814) (1996).
[48] *Bruce v. State*, 259 Ga. 798 (4) (387 SE2d 886) (1990).
[49] *Carr v. State*, 267 Ga. 701 (6) (482 SE2d 314) (1997).
[50] See id.

19. Barnes claims that the trial court erred in its charge on self-defense and mutual combat. Barnes, however, specifically requested in writing the charge about which he now complains and, even assuming the charge was incorrect, such invited error is not grounds for reversal.[51]

20. Barnes complains that the trial court's charge on implied malice improperly shifted the burden of proof. The trial court instructed the jury that "malice may be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." This charge on implied malice is not reversible error.[52]

21. Barnes contends that the trial court erred by allowing the state to introduce impermissible victim-impact evidence. Specifically, Barnes complains about the victim's son identifying the victim from a photograph taken when the victim was alive and testifying about his father's status as a former preacher and stroke victim.

Barnes' only objection to the photograph of the victim was that he had not seen it before trial. The record reveals, however, that the photograph had been in the state's file a week before trial, and that the DA had an open file policy in this case. Later, when the photograph was tendered into evidence, Barnes specifically declined to object to its admission. Under these circumstances, we find no reversible error.[53] Barnes also failed to object to the victim's son's testimony about his father, and this argument is therefore waived on appeal.[54]

22. The record does not support Barnes' claim of prosecutorial misconduct.

23. Barnes did not object to any portion of the state's opening statement or closing argument in the guilt/innocence phase of the trial. "When no timely objection is interposed, the test for reversible error is not simply whether or not the argument is objectionable, or even if it might have contributed to the verdict; the test is whether the improper argument in reasonable probability changed the result of the trial."[55] We find no error sufficient to overcome this procedural default.

24. The admission of evidence regarding two guns other than the murder weapon was not error. Both weapons, the shotgun bought by Brown at the same time as the purchase of the murder weapon and

---

[51] *Burgess v. State*, 264 Ga. 777 (24) (450 SE2d 680) (1994); *Patterson v. State*, 233 Ga. 724 (7) (213 SE2d 612) (1975).

[52] *Gambrel v. State*, 260 Ga. 197 (3) (391 SE2d 406) (1990).

[53] See *Garcia v. State*, 267 Ga. 257 (2) (477 SE2d 112) (1996); *Ledford v. State*, 264 Ga. 60 (14) (439 SE2d 917) (1994).

[54] *Earnest v. State*, 262 Ga. 494 (1) (422 SE2d 188) (1992).

[55] *Todd v. State*, 261 Ga. 766 (2) (a) (410 SE2d 725) (1991).

the Bersa .380 pistol bought by Barnes the day of the murder with the proceeds of the robbery, were relevant and admissible.[56]

25. The trial court did not err by admitting 17 photographs that depict the victim's body. The photographs were relevant and admissible to show the nature and location of the victim's wounds on his head, face and torso, the location and position of the body, and the location of the body in relation to other crime scene evidence such as blood drops and shell casings.[57] Furthermore, Barnes did not object to the admission of these photographs into evidence so this argument was not preserved for appeal.[58]

26. During the cross-examination of Barnes, the state had Barnes step down and demonstrate his version of the fight. While Barnes reenacted the struggle and shooting, the state continued to question him. After considerable demonstration and questioning, the state asked Barnes to show the jury how he fired the last shot into the victim's head. The defense counsel then objected for the first and only time during this demonstration, stating that this issue was "unnecessary" because Barnes had already testified about it. Now, on appeal, Barnes claims that the reenactment was unduly prejudicial. Generally, grounds which may be considered on appeal are limited to those which were raised before the trial court.[59] Under these circumstances, we find no error.

27. Barnes complains that the trial court committed error by refusing to permit the introduction of several items into evidence in the sentencing phase of the trial. The trial court excluded a love poem Barnes had written for his wife. The trial court stated that the poem, the only poem that Barnes sought to admit, was not relevant to Barnes' character because "everybody loves their wife." The trial court also excluded many photographs on the grounds of relevance. Photos of Barnes as a child and photos of his family when he was growing up were excluded because they would be, according to the trial court, "staged photos of apparent innocence." The trial court ruled that only photos of Barnes that were less than five years old would be admissible. The judge also excluded photographs of Barnes' one-year-old child, his two stepchildren and his young handicapped nephew. The trial court maintained that he would only permit evidence that was "neutral to the engenderment of staged emotion" and which did not "innately engender sympathy."

Barnes claims that he was harmed by the exclusion of this evidence. A main defense theme was that Barnes' life had unraveled due

[56] See *Crozier v. State*, 263 Ga. 866 (2) (440 SE2d 635) (1994).
[57] See *Burgan v. State*, 258 Ga. 512 (3) (371 SE2d 854) (1988).
[58] *Earnest*, supra.
[59] *Clark v. State*, 249 Ga. 18 (287 SE2d 523) (1982).

to the divorce of his parents when he was 13 years old, and Barnes contends that the childhood photos would have helped to illustrate this point. Barnes also wanted to show the jury that a death sentence would impact the children in his life, especially his daughter and his nephew, and pictures would have made this argument more real and apparent to the jury. The children were not present in the courtroom so the photographs were the only opportunity for the jury to see them. The state counters that this proffered evidence was irrelevant to Barnes' character, record, and the circumstances of his offense and was properly excluded. The state also argues that 11 family members and friends testified about everything depicted in the photographs, rendering any possible error harmless.

The United States Supreme Court has espoused an expansive view toward the mitigation evidence that a jury may consider in the sentencing phase of a capital trial. Because " 'the penalty of death is qualitatively different' from any other sentence,"[60] "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."[61] The United States Constitution " 'limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence.' "[62] For this reason, the United States Supreme Court has held that it was reversible error for a sentencer to refuse to consider a defendant's violent family background,[63] and that it was reversible error to exclude evidence in the sentencing phase that the defendant had been a good prisoner.[64] A jury must be permitted to fully consider evidence that mitigates against a death sentence in order to give a reasoned moral response to the defendant's background, character and crime.[65] It is "desirable for the jury to have as much information before it as possible when it makes [a] sentencing decision."[66]

Georgia law is also permissive with regard to the scope of mitigating evidence that a jury may consider in the sentencing phase. OCGA § 17-10-30 is wholly silent on the definition of mitigating cir-

---

[60] *Lockett v. Ohio*, 438 U. S. 586, 604 (98 SC 2954, 57 LE2d 973) (1978), quoting *Woodson v. North Carolina*, 428 U. S. 280, 305 (96 SC 2978, 49 LE2d 944) (1976).

[61] (Emphasis in original.) *Lockett*, supra.

[62] (Emphasis in original.) *Penry v. Lynaugh*, 492 U. S. 302, 327 (109 SC 2934, 106 LE2d 256) (1989), quoting *McCleskey v. Kemp*, 481 U. S. 279, 304 (107 SC 1756, 95 LE2d 262) (1987).

[63] *Eddings v. Oklahoma*, 455 U. S. 104 (102 SC 869, 71 LE2d 1) (1982).

[64] *Skipper v. South Carolina*, 476 U. S. 1 (106 SC 1669, 90 LE2d 1) (1986).

[65] *Penry*, supra.

[66] *Gregg v. Georgia*, 428 U. S. 153, 204 (96 SC 2909, 49 LE2d 859) (1976).

cumstances, and the "conclusion is inescapable that the legislature meant to empower the jury to consider as mitigating anything they found to be mitigating, without limitation or definition."[67] Georgia provides a defendant with more protection than that provided under *Lockett*, and a trial court " 'should exercise . . . broad discretion in allowing *any* evidence reasonably tending toward mitigation.' "[68] In fact, this Court has held that evidentiary rules may be trumped by a defendant's need to introduce mitigation evidence.[69]

In Georgia, mitigation evidence that relates to the individual defendant and not to the death penalty in general is admissible.[70] For example, evidence that concerns the defendant's guilt or innocence cannot be excluded by the trial court, even though a guilty verdict has already been rendered in the guilt/innocence phase.[71] The defendant's impaired "capacity to understand the cruelty of his acts" due to depression, poor impulse control, a troubled youth, and drug abuse is relevant at the sentencing phase.[72] It is reversible error to prevent a friend or relative of the defendant from taking the stand and pleading with the jury for mercy.[73] In fact, mercy for the individual defendant is, by itself, a valid reason for a jury to decline to impose a death sentence — a jury can withhold the death penalty for any reason or no reason at all.[74]

In contrast, properly excluded mitigation evidence has involved circumstances that confront many or all capital defendants and does not focus on the character, background or offense of the particular defendant on trial. For example, we have held that mitigation evidence on the nature of electrocution,[75] life on death row[76] and the nondeterrent effect of capital punishment[77] is inadmissible. Evidence concerning the machinations of the criminal justice system outside

---

[67] *Spivey v. State*, 241 Ga. 477 (2) (246 SE2d 288) (1978).

[68] *Cofield v. State*, 247 Ga. 98 (7) (274 SE2d 530) (1981), quoting *Brooks v. State*, 244 Ga. 574 (5) (261 SE2d 379) (1979), vacated on other grounds *Brooks v. Kemp*, 762 F2d 1383 (11th Cir. 1985).

[69] *Collier v. State*, 244 Ga. 553 (11) (261 SE2d 364) (1979) (inadmissible hearsay may be admissible in sentencing phase if offered as mitigation evidence), overruled on other grounds *Thompson v. State,* 263 Ga. 23 (426 SE2d 895) (1993); *Cobb v. State*, 244 Ga. 344 (28) (260 SE2d 60) (1979) (reversible error for trial judge to disqualify mitigation witness due to violation of rule of sequestration).

[70] See *Turner v. State*, 268 Ga. 213 (3) (486 SE2d 839) (1997); *Franklin v. State*, 245 Ga. 141 (7) (263 SE2d 666) (1980) (evidence of mitigating circumstances involves evidence about the particular defendant and not evidence about the death penalty in general).

[71] *Blankenship v. State*, 251 Ga. 621, 624 (308 SE2d 369) (1983).

[72] See *Bright v. State*, 265 Ga. 265 (2) (455 SE2d 37) (1995).

[73] See *Romine v. State*, 251 Ga. 208 (11) (305 SE2d 93) (1983); *Childs v. State*, 257 Ga. 243 (19) (b) (357 SE2d 48) (1987); *Cofield*, supra.

[74] *Bright*, supra.

[75] *Pope v. State*, 256 Ga. 195 (9) (345 SE2d 831) (1986).

[76] *Franklin*, supra.

[77] *Fleming v. State*, 265 Ga. 541, 542-543 (458 SE2d 638) (1995).

the defendant's control, such as whether the defendant was offered a plea bargain of life,[78] is also inadmissible. The victim's bad character is not admissible in the sentencing phase.[79] None of this excluded mitigation evidence concerns the particular defendant's background and character — what it is *about him* that the jury should consider in deciding whether to spare his life.

We reaffirm that no unnecessary restrictions should be imposed on the mitigation evidence that a defendant can present in the sentencing phase regarding his individual background and character.[80] All doubt should be resolved in favor of admissibility given the enormity of the penalty in a case such as this. The state warns of "endless hours of home movies," but the trial court has the discretion to exclude mitigation evidence that is unreasonably cumulative[81] and will certainly prevent this situation from occurring.

The excluded mitigation evidence was relevant. Barnes' love poem to his wife shows that he may be more than just a cold-blooded killer. His childhood photographs shed light on his background because they serve to illustrate that his childhood was happy until it was disrupted by the divorce of his parents. Similarly, the photographs of his child and stepchildren show that he is a father in a way that no amount of testimony could duplicate. The pictures also constitute an appeal to mercy, something that the trial court alluded to when he stated: "I think these photos express the hopes of the parents. I think they sometimes express the hopes of the accused himself, especially when it's of his own infant child and his wife." When the trial court stated that he would not permit any photographs or other mitigation evidence that "innately engender[ed] sympathy," he limited the ability of Barnes to appeal to the merciful nature of the jury.[82]

The trial court erred by excluding this mitigation evidence. Under our system of laws, a defendant facing the penalty of death may beg for mercy and ask the jury to assign a value to his life that precludes execution. In so doing, he may put before the jury mitigating evidence. In this case, due to the unlimited and undefined nature of mitigating evidence and the complete elimination of the photographs and Barnes' poem from the jury's consideration,[83] we cannot conclude that the trial court's exclusion of the mitigating evidence at issue was harmless. Therefore, we reverse the death sentence and

---

[78] *Davis v. State*, 255 Ga. 598 (24) (340 SE2d 869) (1986).
[79] *Hill v. State*, 263 Ga. 37 (16) (427 SE2d 770) (1993).
[80] See *Cobb*, supra; *Gregg*, supra.
[81] *Lockett*, supra at 604, n. 12; *Cobb*, supra.
[82] See *Legare v. State*, 250 Ga. 875 (2) (302 SE2d 351) (1983) (error to charge jury that they are not to base their sentencing decision on sympathy).
[83] See *Cobb*, supra.

remand for a new sentencing trial.

28. Because we reverse Barnes' death sentence for the foregoing reason, his remaining enumerations of error regarding the sentencing phase of the trial need not be addressed.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Fletcher, P. J., who concurs in the judgment only as to Division 15.*

DECIDED MARCH 2, 1998 —
RECONSIDERATION DENIED APRIL 2, 1998.
Murder. Newton Superior Court. Before Judge Sorrells.
*James E. Millsaps, Horace J. Johnson, Jr.,* for appellant.
*Alan A. Cook, District Attorney, W. Kendall Wynne, Jr., Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Beth Attaway, Assistant Attorney General,* for appellee.