## A04A1973. BASS v. THE STATE.
(609 SE2d 386)

MIKELL, Judge.

Travis Antonio Barner and Cornelius A. Bass were jointly indicted, tried and convicted of armed robbery. We affirmed Barner's conviction,[1] and in this appeal, we affirm Bass's conviction as well.

1. Bass first argues that the trial court erred by rejecting his challenge to the sufficiency of the evidence. "On appeal from a criminal conviction, we view the evidence in the light most favorable to the jury's verdict, and the defendant no longer enjoys the presumption of innocence."[2] We do not weigh the evidence or determine witness credibility, but only decide whether the evidence was sufficient for a rational trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt.[3]

So viewed, the evidence shows that the Valley Stop & Shop, a convenience store, was robbed at approximately 11:00 a.m. on July 4, 2003. Parvis Dajani, who helps her husband manage the store, testified that she had just finished serving a female customer who wanted to play Lotto when the woman suddenly ran out of the store. Dajani noticed that a man was talking to the other employee, Gautam "Tom" Chokshi. She saw that the man, who was later identified as Bass's co-defendant, Travis Barner, was carrying a shotgun. Barner, who was wearing a dark mask, ordered Dajani to open the register and hand him the money, which totaled $650. A videotape of the robbery was introduced into evidence, but Barner's face was obscured by the mask.

Marcus Green, Jr., a ninth grader who lives across the street from the store, testified that he was in his backyard on the morning of the incident when he saw Barner standing in the path near the store with a shotgun while Bass was standing on the other side of the street from the store. Green was able to identify the men because he had seen them once before at the store. Green also had seen Barner previously at an apartment complex. Green testified that while Barner stood in the path, Bass stood to the side of the store and used hand signals to alert Barner to the presence of people in the store. Green further testified that he watched Barner change into a dark shirt, put on a mask, and enter and exit the store. According to Green, after Barner came out, Bass ran to meet him.

Green's mother, Lutricia Watkins, testified that she saw the men from her bathroom window. She was acquainted with Bass and

---

[1] *Barner v. State*, 271 Ga. App. 233 (609 SE2d 385) (2005).

[2] (Citation omitted.) *Bates v. State*, 259 Ga. App. 232, 233 (1) (576 SE2d 619) (2003).

[3] Id., citing *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

testified that she saw him meet up with his co-defendant and run away from the scene after the robbery.

Bass argues that the evidence is insufficient to support his conviction because Watkins was impeached and because the remainder of the state's evidence created only a bare suspicion of guilt. Bass claims that Watkins admitted on cross-examination that she did not know Bass. But Watkins testified only that she did not know Bass by his correct name; she knew him as "Jolly" because that was his mother's name. Accordingly, Watkins was not impeached, and, in any event, it was for the jury to resolve any conflicts in the evidence and to assess Watkins's credibility.[4] We find the evidence recounted above more than sufficient to allow a rational trier of fact to conclude that Bass was guilty beyond a reasonable doubt as a party to the crime of armed robbery.[5]

2. Bass contends that the trial court erred in failing to give a jury charge on his sole defense of alibi. Bass did not request an alibi charge, however, and it is ordinarily not error for the court to fail to charge on alibi absent a request.[6] This is true even if alibi is "the sole defense."[7] The rationale underlying this rule is that alibi is not an affirmative defense.

> [S]ince the true effect of an alibi defense is to traverse the state's proof that the defendant committed the crime, the charge that the burden is on the state to prove that the defendant committed the crime beyond a reasonable doubt itself necessarily covers the question of whether the evidence of alibi was sufficient to create a reasonable doubt.[8]

Here, the court fully charged the jury on the presumption of innocence and the burden of proof beyond a reasonable doubt. Moreover, alibi was not Bass's "sole defense." Bass asserted the defense of mistaken identity, and the court gave a lengthy and complete charge on that issue. Finally, the testimony of Bass's alibi witnesses did not establish the impossibility of his presence at the scene of the robbery at the time of its commission. "It is well settled that where the

---

[4] *McRae v. State*, 252 Ga. App. 100, 102 (1) (c) (555 SE2d 767) (2001).

[5] *Jackson v. Virginia*, supra; *Nealy v. State*, 239 Ga. App. 651, 654-655 (5), (6) (522 SE2d 34) (1999).

[6] *Rivers v. State*, 250 Ga. 288, 300 (8) (298 SE2d 10) (1982). Accord *Johnson v. State*, 174 Ga. App. 751, 752 (2) (330 SE2d 925) (1985).

[7] (Punctuation omitted.) *Seese v. State*, 235 Ga. App. 181, 183 (1) (509 SE2d 94) (1998).

[8] (Citations omitted.) *Rivers*, supra.

evidence in support of the defense of alibi does not show the impossibility of the defendant's presence at the scene of the crime at the time of its commission, the failure of the court to charge the law of alibi is not error."[9]

Both Dajani and Chokshi testified that the robber entered the store at 11:00 a.m. Bass's first alibi witness testified that he never saw Bass after 10:15 a.m. The second alibi witness, Bass's girlfriend, testified that she saw him between 10:15 a.m. and 10:30 a.m. and then again later that morning, although she was unsure of the time. The third witness, Bass's mother, Suvita Ann Jolly, testified that Bass came home around 10:15 a.m. and that she sent him to the convenience store at 10:55 a.m. Although she claimed that she saw that Bass never made it to the store, because her backyard faces toward the store, she admitted on cross-examination that she based this conclusion not on what she saw, but on what Bass had told her. She also testified that he came running back from the store, followed shortly by Barner. Under these circumstances, the trial court did not err in failing to charge the jury on alibi absent a request from the defendant.

3. Bass next argues that the trial court erred in refusing to admit into evidence a photograph of a man named Jim Butler who allegedly resembles him. Bass asserts that Butler was the person involved in the robbery and that the photograph was relevant to show the jury that the witnesses had mistakenly identified Bass.

"Generally, [the] accused may introduce evidence tending to show that another person committed the crime with which he is charged, if a proper foundation is laid, unless the probative value of the evidence is substantially outweighed by actual risk of undue delay, prejudice, or confusion."[10]

> This evidence . . . must be such proof as directly connects the other person with the corpus delicti, and tends clearly to point out someone besides [the] accused as the guilty person. Evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.[11]

This issue arose during the cross-examination of Vetrimyer Miller, a Fort Valley Police Department detective who investigated

---

[9] (Citations and punctuation omitted.) *Hulett v. State*, 262 Ga. 194, 195 (2) (415 SE2d 642) (1992).

[10] (Punctuation omitted.) *Bradford v. State*, 204 Ga. App. 568, 569 (420 SE2d 4) (1992).

[11] (Citation and punctuation omitted.) *Croom v. State*, 217 Ga. App. 596, 599 (3) (458 SE2d 679) (1995).

the robbery. Bass's counsel asked Miller whether he had received information that a man named Jim Butler "may have been involved" in the robbery. Miller replied, "I have heard it, yes, sir." Counsel asked no further questions of Miller concerning Butler's alleged involvement. Instead, counsel asked Miller to identify the photograph. However, counsel did not move for the admission of the photograph until after the evidence was closed. The trial court excluded the photograph because no evidence had been introduced to connect Butler to the crime. However, as noted above, the court charged the jury on the issue of identity. As Miller's testimony that he had "heard" that Butler "may have been involved" in the robbery did nothing more than cast a bare suspicion on Butler, the trial court did not abuse its discretion in refusing to admit the photograph.[12]

4. Finally, Bass argues that the trial court erred by rejecting his *Batson*[13] challenge to the state's use of three peremptory strikes against African-American jurors.

> The evaluation of a *Batson* challenge involves a three-step process: (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven discriminatory intent.[14]

The threshold issue of whether Bass established a prima facie case of discrimination is moot because the state offered purportedly race-neutral reasons for its strikes and the trial court ruled on the ultimate issue of purposeful discrimination.[15] Therefore, we need only examine the sufficiency of the state's proffered reasons for striking the jurors in question.[16] A race-neutral explanation need not be persuasive, plausible or even make sense; it must simply be based on something other than the juror's race.[17] "Unless a discriminatory intent is inherent in the proponent's explanation, the reason offered will be deemed race neutral."[18]

Based on these guidelines, the state's explanations for the three strikes were race-neutral. The prosecutor stated that he excused the

---

[12] Id.

[13] *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

[14] (Citation omitted.) *Thomas v. State*, 274 Ga. 156, 161 (5) (549 SE2d 359) (2001).

[15] *Byers v. State*, 212 Ga. App. 110, 112 (2) (441 SE2d 290) (1994).

[16] Id.

[17] *Smith v. State*, 236 Ga. App. 122, 124 (2) (511 SE2d 223) (1999).

[18] (Citation and punctuation omitted.) Id.

first prospective juror, no. 17, because he was about the same age as the defendants and because he was a cousin of another juror who had been struck due to her relationship with Bass's mother. As to the second prospective juror, no. 21, the prosecutor indicated that he struck him because the juror had seen defendant Barner "around town" and "knew the area well." The reason offered for striking the third prospective juror, no. 23, was that he lied when asked whether he had ever served on a jury. According to the prosecutor, juror no. 23 caused a hung jury by being the lone holdout for acquittal in a case previously tried by the state. "Previous participation in a verdict of not guilty in a criminal trial is a legitimate race-neutral reason to exercise a strike . . . as is acquaintance with a member of the defendant's family."[19] It follows that being the lone holdout for acquittal in a criminal trial and having a familial relationship with an acquaintance of a defense witness are also race-neutral reasons for exercising strikes. Finally, "[a] prospective juror's knowledge of the defendant is a legitimate explanation for a peremptory strike."[20]

After a race-neutral reason is offered for a strike, the burden of proving that the proffered explanation is merely pretext for discrimination then shifts back to the challenging party.[21] Bass argues, inter alia, that he carried his burden of proving that the race-neutral reason given by the state for striking prospective juror no. 21 was pretextual because the state did not strike a similarly situated juror who knew both defendants by sight.

> The trial court's decision on a *Batson* motion rests largely upon assessment of the prosecutor's state of mind and credibility; it therefore lies peculiarly within a trial judge's province. The trial court's factual findings must be given great deference and may be disregarded only if clearly erroneous. The factors that make up a trial court's credibility determination under *Batson* will often go beyond the mere words that accompany the record before the appellate courts.[22]

---

[19] (Citations omitted.) Id. See also *Barnes v. State*, 269 Ga. 345, 350 (6) (496 SE2d 674) (1998).

[20] (Citation omitted.) *Aldridge v. State*, 222 Ga. App. 437 (1) (475 SE2d 195) (1996). See also *Wilbanks v. State*, 251 Ga. App. 248, 253 (4) (554 SE2d 248) (2001) (juror's passing familiarity with accused held clearly a race-neutral explanation).

[21] *Harris v. State*, 251 Ga. App. 475 (554 SE2d 606) (2001).

[22] (Citation omitted.) *White v. State*, 258 Ga. App. 546, 549-550 (3) (574 SE2d 629) (2002). Accord *Barnes*, supra at 349 (6).

In the case at bar, we are unable to evaluate the allegation of similarity between the challenged juror, no. 21, and the juror accepted by the state because, except for the *Batson* argument, voir dire was not transcribed.[23] Therefore, we find that Bass, as opponent to the strike, has failed on appeal to carry his ultimate burden of persuasion regarding racial motivation for the strike.[24] Moreover, the court held that the reasons offered by the state for its strikes were not pretextual. In addition, the trial court noted that the racial makeup of the jury reflected that of the panel. Six white and six African-American jurors were selected from a panel of thirty potential jurors, sixteen white and fourteen African-American. Based on the record before us, we hold that the trial court's findings were not clearly erroneous.

*Judgment affirmed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED JANUARY 6, 2005.

*Robert M. Bearden, Jr.,* for appellant.
*Howard Z. Simms, District Attorney,* for appellee.

