## A01A1872. WILLIAMS v. THE STATE.
## A01A1873. JAMES v. THE STATE.
### (559 SE2d 516)

BLACKBURN, Chief Judge.

James Gregory Williams was convicted by a jury of the crime of armed robbery. His co-defendant, Earl A. James, was convicted by the jury of the crimes of armed robbery and aggravated battery. Following the denial of their motions for new trial, each defendant filed a notice of appeal. Williams contends that the court erred: in denying James's motion to sever; in denying his motion for change of venue; in admitting into evidence his in-custody statement; and in allowing him to be identified at trial. James maintains that the trial court erred in failing to grant his motion for new trial because of a *Batson* violation. Both Williams and James claim that the trial court erred: in denying their motions for new trial because the evidence was insufficient to convict them; in admitting a handgun into evidence; and in denying a motion for mistrial on the basis of juror misbehavior. Because they were tried together, we have consolidated their appeals for review. For the reasons set forth below, we affirm.

1. Both Williams and James assert that the trial court erred in denying their motions for new trial based on the insufficiency of the evidence.

The standard of review for the sufficiency of evidence, in reviewing either a motion for a directed verdict or a motion for new trial, is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We view the evidence in the light most favorable to the verdict, and [defendants] no longer enjoy[ ] the presumption of innocence; moreover, an appellate court does not weigh the evidence or determine witness credibility but only determines whether the evidence is sufficient under the standard of *Jackson v. Virginia*.[1] Conflicts in the testimony of the witnesses are a matter of credibility for the jury to resolve. As long as there is some competent evidence, even

---

[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

(Citations omitted.) *Willingham v. State.*[2]

Viewed in the light most favorable to support the verdict, the jury was authorized to find that, on the morning of August 22, 1999, Williams and James entered the Macon Olive Garden restaurant through the back door; James wore a dreadlock wig, a grayish shirt, and blue pants while Williams was attired in blue jeans, a white Tommy Hilfiger t-shirt, and a ski mask. Williams appeared to know his way around the restaurant. Williams and James herded the employees into an area near the manager's office, forced the manager to put the restaurant's receipts and Olive Garden gift certificates into a black briefcase, which also contained some of the manager's personal belongings, and then left by way of the rear door. As soon as they left, one of the employees told the others that the robber with the ski mask was Williams, who had worked for several months at the Olive Garden.

While Williams and James were carrying out the robbery, another Olive Garden employee, who had been outside and had seen them enter the restaurant with a gun, ran across the parking lot to a nearby Macon police station and told police officers in the parking lot that the Olive Garden was being robbed. Several policemen, who rushed to the restaurant both on foot and in squad cars, saw Williams and James as they came out of the back door of the restaurant and gave chase. The defendants ran into the Riverbend apartment complex, and as they did so, one of them threw a gun into the bushes. When Williams and James split up, Officer Kinnery chased Williams into a wooded area, caught him, and wrestled him to the ground; when he pulled him to his feet, he found a ski mask on the ground where Williams had been lying.

Two other officers chased James. Officer Mathis spotted James, who was carrying a black briefcase and a wig, emerge from the breezeway between two of the apartment buildings and ordered him to freeze. James ran, and Officer Mathis pursued. Running into the parking lot, James got into a blue Chevrolet Celebrity. When Officer Mathis pulled his car in front of James's car and again ordered him to freeze, James threw the black briefcase, which was found to contain the restaurant receipts and the Olive Garden gift certificates, and the dreadlock wig from the car and then rammed Officer Mathis's car; the resulting collision caused the door of Officer Mathis's vehicle to strike him, causing the loss of an eye. Stunned

---

[2] *Willingham v. State*, 242 Ga. App. 472-473 (530 SE2d 224) (2000).

and unaware of the extent of his injuries, Officer Mathis fired his gun at James as he drove away.

Several officers heard the shots fired by Officer Mathis, and as James exited the apartment complex in the blue Celebrity, some of the officers fired at James's vehicle, hitting one or more of the tires. A chase ensued with James, whose car had at least two flat tires, reaching 70 to 80 mph. Finally, James collided with one of the police cars when he attempted to turn around at a gas station. Police found the grayish shirt and a ski mask in the car, as well as cocaine and a large sum of money on James's person. Meanwhile, back in the parking lot of the apartment complex, one of the officers found the gun which James had thrown into the bushes.

Based on our review of the entire record before us, we find ample evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that both Williams and James were guilty of the offenses with which they were charged.

2. Williams contends that the trial court erred in denying James's motion to sever. There is no merit to this contention.

> It is well established that appellate courts may not consider objections to evidence not raised at trial. If several parties are entitled to make an objection, and it is made by any number less than all, it does not inure to the advantage of the party or parties not joining in it. Thus, where a defendant does not expressly adopt the objection of a co-defendant, he thereby waives that objection and may not utilize it to gain review.

(Citations and punctuation omitted.) *Barnes v. State*.[3] In this case, Williams waived any objection by failing to adopt James's objection. Id.

Even if the issue had been preserved for appeal, the enumeration would be without merit. In ruling on a motion to sever,

> a trial court must consider whether a joint trial will create confusion regarding evidence or law; whether there is danger that evidence implicating one defendant will be considered against co-defendants, despite limiting instructions; and whether the co-defendants will press defenses that are antagonistic to one another. To show abuse of discretion a defendant must do more than raise the possibility that a separate trial would give him a better chance of acquittal.

---

[3] *Barnes v. State*, 168 Ga. App. 925, 926 (2) (310 SE2d 777) (1983).

He must make a clear showing of prejudice that resulted in denial of due process.

(Citation omitted.) *Mathis v. State.*[4]

The issues and defenses in this case were simple and straightforward. "Neither the number of defendants nor their trial tactics created any confusion as to either the evidence or the applicable law. There were only two defendants on trial and the primary issue was the identity of the robbers." *Mathis*, supra. Williams did not testify, and James maintained in his testimony that he did not know Williams and that he had not taken part in the robbery; thus, no issue exists as to conflicting co-defendant testimony. Id. Finally, Williams's and James's defenses were not antagonistic; the only defense either seemed to put forth was that he was not involved in the armed robbery. *Redding v. State.*[5] The trial court did not abuse its discretion when it denied the motion to sever.

3. Williams also asserts that the trial court erred in denying his motion for change of venue. We find no error.

"The trial court has the discretion to grant a change of venue and its determination will not be disturbed absent an abuse of that discretion. [Cit.]" *Happoldt v. State.*[6] Williams, as the movant, has the burden of showing either that Bibb County was an inherently prejudicial venue or that the jury selection process revealed the existence of actual prejudice which kept him from receiving a fair trial. *Roundtree v. State.*[7]

We consider first the question of actual prejudice since the trial judge delayed ruling on Williams's motion to change venue until after voir dire of the jury. The record shows that less than half of the prospective jurors were aware of the publicity surrounding this case and that their exposure to media coverage had occurred months ago at the time of the crime; when each of these prospective jurors was asked, by counsel for both defendants during voir dire and by the trial court at the conclusion of voir dire, if he or she either had formed an opinion as to the defendants' guilt or felt unable to be impartial, not one indicated that either was the case. *Roundtree*, supra. Beyond this, neither Williams nor James exercised any strikes to excuse any juror because of concerns about prejudicial publicity. *McWhorter v. State.*[8] Thus, there is no evidence of actual prejudice.

As to the alternative ground of an inherently prejudiced venue,

---

[4] *Mathis v. State*, 238 Ga. App. 218, 221 (4) (517 SE2d 578) (1999).
[5] *Redding v. State*, 239 Ga. App. 718, 722 (521 SE2d 840) (1999).
[6] *Happoldt v. State*, 267 Ga. 126, 128 (2) (475 SE2d 627) (1996).
[7] *Roundtree v. State*, 270 Ga. 504, 505 (511 SE2d 190) (1999).
[8] *McWhorter v. State*, 271 Ga. 461, 462 (519 SE2d 903) (1999).

"[a] finding that pretrial publicity has so infected a community as to render it an inherently prejudiced venue is authorized only in extremely rare situations. [Cit.]" *Roundtree*, supra at 505 (2). Here, Williams made no showing that the media coverage either contained information that was factually incorrect or was inflammatory or reflective of an atmosphere of hostility. *Happoldt*, supra at 128. This failure to demonstrate an inherently prejudicial venue, coupled with the voir dire which revealed to the trial court that a majority of the jurors had heard nothing of the case in the media and that none of the prospective jurors felt incapable of being impartial and deciding the case on the evidence, confirms us in our conclusion that the trial court did not abuse its discretion in finding that Bibb County was not an inherently prejudicial venue and in denying the motion for a change of venue.

4. Williams next enumerates as error the trial court's admission into evidence of his in-custody statement. In that statement, Williams admitted that he had taken part in the robbery at the Olive Garden and that he had worn a mask because he had worked there in the past, but he insisted that he had not had a gun and had not hurt the two police officers.

(a) Williams first argues that the State failed to show that his statement was voluntary. He maintains that, contrary to the testimony of the police officer, he told the officers that he wanted a lawyer but that the police officers, upset because of the injuries sustained by a fellow officer, ignored his request and coerced him into talking.

The trial court conducted a *Jackson-Denno* hearing before allowing Williams's in-custody statement into evidence and found that he was given his *Miranda* rights, had knowingly, intelligently, and voluntarily waived those rights, and had freely and voluntarily given the statement. Unless clearly erroneous, determinations as to facts and credibility made at a *Jackson-Denno* hearing by the trial court must be accepted by appellate courts. *Cameron v. State.*[9] Our review of the transcript of the *Jackson-Denno* hearing reveals that, in light of the totality of the circumstances, the trial court's findings were not clearly erroneous.

(b) Officer Marberry was the only witness to testify during the *Jackson-Denno* hearing because Officer Mayfield, who also was present at the time Williams made his statement, was recovering from surgery at the time of the trial and was confined to his home. Williams argues that he was entitled to have all witnesses present during his alleged statement testify at the *Jackson-Denno* hearing in order for him to have an examination of the totality of the circum-

---

[9] *Cameron v. State*, 187 Ga. App. 562 (370 SE2d 812) (1988).

stances. "[T]here is no absolute requirement that all law enforcement officers present when in-custody statements are made must be called by the state during a *Jackson-Denno* hearing. [Cit.]" *Steele v. State*.[10] The trial court was convinced of the veracity of Officer Marberry's testimony, and in the absence of any showing that Officer Mayfield's testimony would have contradicted that of Officer Marberry, we are not persuaded that Officer Mayfield's absence at the *Jackson-Denno* hearing denied Williams a full investigation of all circumstances surrounding his statement. *Cook v. State*.[11]

(c) Finally under this enumeration, Williams objects to Officer Marberry's reading his redacted statement into the record because, he claims, Officer Mayfield, rather than Officer Marberry, prepared the statement, and Officer Marberry had no firsthand knowledge of its contents. OCGA § 24-9-69 provides: "A witness may refresh and assist his memory by the use of any written instrument or memorandum, provided he shall finally speak from his recollection thus refreshed or shall be willing to swear positively from the paper." The trial judge conducted a brief hearing on whether Officer Marberry could read the statement into the record pursuant to OCGA § 24-9-69. "In order to swear positively from the paper, it is essential that the witness should at sometime have had personal knowledge of the correctness of the memorandum. It is not necessary that the witness have present recollection of the contents of the document." (Citations and punctuation omitted.) *Mincey v. State*.[12] Officer Marberry testified that the report prepared by Officer Mayfield was an account of the interview that Officers Marberry and Mayfield jointly had with Williams; that Officer Mayfield had made a copy of the report available to him after it was prepared; and that he had checked the report for accuracy and had found it to be a true and accurate account of the interview. The report was prepared just one week after the interview. Officer Marberry also stated that he was willing to swear positively from the report that it was a true and accurate account of the conversation he and Officer Mayfield had had with Williams. We find that the trial court did not err in permitting Officer Marberry to read Williams's statement into evidence.

5. Williams and James both complain that the trial court erred in admitting a handgun into evidence. They point out that no fingerprints could be taken from the gun because of the way it was handled and no ballistics test was done because the gun was not fired; for these reasons, they assert, there is no physical evidence that links

---

[10] *Steele v. State*, 166 Ga. App. 24, 26 (3) (303 SE2d 462) (1983).
[11] *Cook v. State*, 249 Ga. 709, 711 (292 SE2d 844) (1982).
[12] *Mincey v. State*, 257 Ga. 500, 505 (6) (360 SE2d 578) (1987).

the firearm either to them or to the weapon allegedly used in the robbery. There is no merit to this argument.

"A weapon is generally admissible if it is similar to the one used in the crime even though it is not conclusively shown to be the same one." *Davis v. State*.[13] The handgun introduced into evidence was a chrome Lorcin nine-millimeter semi-automatic. The testimony showed that one of the defendants threw the handgun into the bushes and that an officer found the gun in the same bushes. The police established a chain of custody for the weapon. Several victims testified that the gun resembled the one that was used in the robbery, and one victim, whose hobby is guns, specifically told the police that the gun he saw was a "cheap chrome Lorcin nine millimeter." The jury in this case was authorized to determine whether the gun admitted into evidence was the gun used in the Olive Garden robbery, and any discrepancies between eyewitness descriptions of the weapon went to the weight and credibility of the evidence rather than to its admissibility. Id.

6. Both Williams and James also argue that the trial court erred in denying a motion for mistrial on the basis of juror misbehavior. There is no merit to this enumeration of error. The record shows that James, during Williams's closing argument, complained to the court that two jurors were conversing and requested that the court inquire as to whether the jurors were discussing the case. The court conducted this inquiry; the jurors said that they had not been discussing the case and that they were capable of listening to evidence, argument, and the charge of the court and rendering a fair and impartial verdict. At the conclusion of this inquiry, James stated that he still did not believe the jurors could be impartial and moved for a mistrial, but the court denied the motion. James then moved the court to replace the jurors with the alternates. The court gave curative instructions but reserved ruling on the motion to replace the jurors until after closing arguments were completed. At the close of argument, James again asked that the jurors be replaced with the alternates. The court, after seeing that neither the State nor Williams had any objection to the substitution of the alternates, granted James's motion and replaced the two jurors with the alternates.

Here, the trial court inquired into the alleged juror misconduct, determined that the jurors were capable of making a fair and impartial assessment of the evidence, but, out of an abundance of caution, granted the defendant's motion to replace the jurors with the alternates. Under these circumstances, the trial court did not abuse its discretion.

---

[13] *Davis v. State*, 272 Ga. 327, 330 (4) (528 SE2d 800) (2000).

7. Williams contends that the trial court erred in allowing him to be identified at trial. Specifically, Williams argues that his identification at trial by one of the victims was caused by police suggestiveness in that the police "paraded" him in front of the media as he was taken into custody and then took statements from witnesses after they had seen him being taken into custody on television. We find no error.

The issue of suggestive pretrial identification was addressed by the United States Supreme Court in *Neil v. Biggers*.[14] "However, the principle expressed in *Neil v. Biggers* deals with the suggestiveness of an identification procedure used by police, and applies only to state action. [Cits.]" *Semple v. State*.[15] In this case, there is no evidence that the police or any other state actors were involved with either televising Williams's arrest or otherwise suggesting an identification to the witnesses. Id. Beyond that, issues of witness credibility are for the trier of fact, and matters such as the basis for a witness's identification of Williams and the witness's ability to observe him at the crime scene were subjects for cross-examination and did not require that the identification testimony be excluded. Id.

8. Finally, James complains that the court erred in failing to grant his motion for new trial because of a violation under *Batson v. Kentucky*.[16] Here, too, there was no error.

The record shows that the State struck seven blacks and three whites from the panel. Eleven black jurors were accepted by the State, and some of these jurors were impaneled. The defense struck four blacks. One other black juror was accepted by the State in the alternate pool, but this juror was struck by defendant James. Defense counsel objected to the racial composition of the panel. The trial court apparently assumed the existence of a prima facie case of purposeful discrimination and required the State to articulate its reasons for the strikes.

> Once a prima facie case of discrimination is made, the proponent of the strike is required to set forth a race-neutral, case-related, clear and reasonably specific explanation for the exercise of its strikes. An explanation is not race-neutral if it is based on a characteristic that is peculiar to any race or on a stereotypical belief. At this point, the proponent of the strike need not proffer an explanation that is persuasive or even plausible — all that is required is an explanation that is facially race-neutral. The trial court must then determine, considering the totality of the circumstances, whether

---

[14] *Neil v. Biggers*, 409 U. S. 188 (93 SC 375, 34 LE2d 401) (1972).
[15] *Semple v. State*, 271 Ga. 416, 417-418 (2) (519 SE2d 912) (1999).
[16] *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

the opponent of the strikes has shown that the proponent was motivated by discriminatory intent in the exercise of his strikes. The opponent of the strikes may carry his burden of persuasion by showing that similarly situated jurors of another race were not struck or that the proponent's race-neutral reason for a strike is "so implausible or fantastic that it renders the explanation pretextual." A trial court's findings on whether the opponent of the strike has met his burden of persuasion is entitled to great deference and will be affirmed unless clearly erroneous.

(Footnotes omitted.) *Barnes v. State*.[17]

(a) James first objects to the striking of Juror No. 5. The State explained its striking of this juror as follows:

Number 5 is Sharon D. Childs. Now, this is, this is where I had a problem. I had the original clerk's list, which is a 13 page document, and I could not find the name of Sharon D. Childs on this list. That's why I asked the question I did about people who may've had their name changed. However, there is a Sharon Denise Rawls who had some sort of a simple battery case against her at some point and, out of an abundance of caution about the fear that Sharon D. Childs may have at one time been Sharon Denise Rawls, I exercised a strike. I don't know any more information beyond that to give the Court, but I looked and looked and looked on this to be sure that I couldn't find Sharon D. Childs. I could find no other similar name, so I had to conclude that Sharon D. Childs must have been Sharon D. Rawls.

The trial court found both that the State's explanation for the strike was race-neutral and that James failed to carry his burden of showing that the reason was a pretext for purposeful discrimination. We agree. James cites *Ridley v. State*[18] and *Trammel v. State*[19] as support for his argument. Those cases are not on point as they deal with situations in which a juror shared the same name with a defendant the State had prosecuted, not with situations in which a juror is suspected of being the same person who was a defendant in another case even though the names are not the same.

---

[17] *Barnes v. State*, 269 Ga. 345, 349 (6) (496 SE2d 674) (1998).
[18] *Ridley v. State*, 235 Ga. App. 591 (510 SE2d 113) (1998).
[19] *Trammel v. State*, 265 Ga. 156 (454 SE2d 501) (1995).

(b) James also objects to the striking of Juror No. 11. The State explained the strike as follows:

> The next one was Juror Number 11, Mr. Battle. Mr. Battle was the juror that, when I asked the question of those who had been to court before, began relating a long story about not only a case that he'd been a juror on somewhere else but relating all the details in that case, and I finally kind of had to stop him to — I frankly did not — I was not impressed by Mr. Battle's long rambling answer, and for that reason I decided to strike him.

The trial court again found, and we agree, both that the State's explanation for the strike was race-neutral and that James failed to carry his burden of showing that the reason was a pretext for purposeful discrimination. Juror No. 11's long, rambling account of his involvement in another trial was not responsive to the simple inquiry as to whether any of the jurors in the panel had been in court before. This Court has held that a prospective juror's lack of responsiveness is a race-neutral exercise of a peremptory challenge. *Thompson v. State*.[20]

(c) James's final challenge is to the striking of Juror No. 43. The State gave the following reason for the strike.

> He said he worked at Church's Fried Chicken and was single, was very young, and maybe I'm old-fashioned, but anyone who can work at Church's Fried Chicken and afford that much gold jewelry in his ears and around his neck, I submit, is not a good State's juror.

With respect to this juror, too, the trial court found both that the State's explanation for the strike was race-neutral and that James failed to carry his burden of showing that the reason was a pretext for purposeful discrimination. We do not find this finding clearly erroneous.

James argues that a juror's wearing a lot of jewelry is not a proper basis for a strike,[21] while the State reminds us that "[t]he

---

[20] *Thompson v. State*, 194 Ga. App. 163 (390 SE2d 253) (1990).

[21] This Court also has recognized that

unconventional methods of self-adornment in attire, hair style, hair color, shaving the head, jewelry, tattoos, or scarification, may indicate youthful rebellion against authority and convention, or anti-social attitudes, or identification that would extend across gender and racial lines. Such may constitute a race/gender-neutral reason to strike. However, if such matters were shown to be *unique* to a racial or gender identification, then it could constitute an impermissible explanation. How-

nature of a prospective juror's employment 'is not a characteristic that is peculiar to any race.'" *Trice v. State.*[22] We believe, however, that neither line of argument addresses the prosecutor's concerns about this prospective juror. The transcript reveals that the prosecutor's concern was not with the juror's jewelry or his place of employment but rather, we think, with the apparent lack of responsibility and maturity of a young man who, though earning minimum wage, nonetheless spends a significant amount of his income on gold jewelry. That concern with youthful irresponsibility in a prospective juror is a legitimate, neutral, and nonracial reason for striking the juror; certainly, James falls far short of meeting his burden of showing that the State's reason was mere pretext for purposeful discrimination.

*Judgment affirmed. Pope, P. J., and Mikell, J., concur.*

DECIDED JANUARY 25, 2002.

*Wm. Lee Robinson*, for appellant (case no. A01A1872).
*Reza Sedghi*, for appellant (case no. A01A1873).
*Howard Z. Simms, District Attorney, Graham A. Thorpe, Myra H. Kline, Assistant District Attorneys*, for appellee.

ever, such exclusive identification with race or gender would be part of the movant's ultimate burden of persuasion.
(Emphasis in original.) *Knuckles v. State*, 236 Ga. App. 449, 452-453 (1) (b) (512 SE2d 333) (1999).
[22] *Trice v. State*, 266 Ga. 102, 103 (2) (464 SE2d 205) (1995).