**Michelle Garner HALL, Petitioner-Appellant,**

v.

**WARDEN, LEE ARRENDALE STATE PRISON, Respondent-Appellee.**

**No. 14-14619**

United States Court of Appeals, Eleventh Circuit.

(April 20, 2017)

simply refile her claim in the Southern District of New York.

John Lovell, John R. Lovell, Esq., PC, Newnan, GA, for Petitioner-Appellant

Katherine Lee Iannuzzi, Paula Khristian Smith, Samuel Scott Olens, David Allan Zisook, Attorney General's Office, Atlanta, GA, for Respondent-Appellee

Before TJOFLAT and MARTIN, Circuit Judges, and ROSENTHAL,[*] District Judge.

PER CURIAM:

Michelle Hall is serving a life sentence in Georgia state prison for shooting her husband to death during an argument in their home. The only other person in the house at the time was Ms. Hall's eight-year-old daughter, Alyssa, who was in another room and heard but did not see the argument and the shooting.

At her trial approximately a year later, Ms. Hall used the audio recording of the statement she made when she called the 911 operator and the video recording of her statements to law enforcement to raise the defenses of justification and accident. Her defenses were that she and her husband had struggled because she was trying to prevent him from killing her and then himself, and that he was fatally wounded when the gun accidentally discharged in the struggle. Alyssa, testifying for the State, told the jury that from her bedroom over the room where the couple argued and struggled, she heard her stepfather say "put the gun down," and "Michelle, don't do this," followed by gunshots.

The trial judge had Alyssa testify through a closed-circuit video feed, separated from the jury and the defendant. Alyssa testified in the judge's conference room, with the trial judge, the prosecutor, and Ms. Hall's defense counsel present. The jury and Ms. Hall were in the courtroom and watched the testimony on a television screen displaying the video feed. Ms. Hall could not talk with or send to, or receive written notes from, her lawyer, or communicate with him in any way, during Alyssa's testimony. Although Ms. Hall and her lawyer knew that Alyssa would be testifying via closed-circuit television, they had no prior notice that during her testimony, they would be in separate rooms with no way to communicate with each other.

The jury convicted Ms. Hall of malice murder, felony murder, and aggravated assault. She was sentenced to life in prison. After an unsuccessful direct appeal and collateral proceedings in the Georgia state courts, she petitioned for a writ of habeas corpus under 28 U.S.C. § 2254. The federal district court denied the petition but granted a certificate of appealability limited to her "claim of ineffective assistance of appellate counsel."

Our review of the record shows that the Georgia Supreme Court's denial of Ms. Hall's claim was contrary to clearly established Supreme Court precedent. Ms. Hall received constitutionally ineffective assistance when her appellate counsel failed to raise any claim based on Ms. Hall's inability to communicate with her trial counsel during the testimony of the State's star witness. The failure to do so was deficient, and there is a reasonable probability that

---

[*] Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

the claim would have changed the outcome of the direct appeal. We therefore reverse and remand with instructions that the district court order the State to grant Ms. Hall a new direct appeal.

## I. BACKGROUND

### A. Trial and Direct Appeal

Ms. Hall was tried in September 2009. After jury selection, the judge asked the lawyers on the record if they were "in agreement" about "the procedure in the event the child testifies live." The prosecutor responded, "I believe so." The judge then stated, "It will be done by closed circuit," and the prosecutor interrupted, "Yes, yes, yes. We addressed that in the back." The prosecutor told the court that he and Ms. Hall's attorney had agreed to have Alyssa testify over closed-circuit television, rather than in front of the jury and the defendant. The prosecutor identified Georgia Code § 17-8-55 as authority for this procedure.

The Georgia statute in effect at the time stated that "sex offense victims under 10 years of age" could have their testimony "taken outside the courtroom and shown in the courtroom by means of a two-way closed circuit television" if "[t]he judge determines that testimony by the child victim in the courtroom will result in the child's suffering serious emotional distress such that the child cannot reasonably communicate." Ga. Code Ann. § 17-8-55(a)(2) (2009).[1] Under the statute, the judge, the prosecutor, and the defense attorney would be the only ones allowed in the room where the child was testifying. Id. § 17-8-55(d).[2] But the statute also stated that "[t]he defendant shall be allowed to com-

municate with the persons in the room where the child is testifying by any appropriate electronic method." Id. § 17-8-55(f).

This statute did not apply to authorize the procedure the court used in Ms. Hall's trial. Alyssa was not a sex-offense victim, the judge made no determination of serious emotional distress if she testified in court, and no provision was made for Ms. Hall to communicate with those in the room where Alyssa testified.

The next morning, the judge confirmed that Alyssa would testify "by close-circuit." Ms. Hall's lawyer replied, "Yes. I have no problem with that." There was no mention that Ms. Hall would be separated from her lawyer during Alyssa's testimony and unable to communicate with him. Ms. Hall's attorney testified that he consented to the closed-circuit-television procedure only to prevent the State from admitting two prior statements Alyssa had made, an audio statement recorded the night of the murder and a videotaped statement taken several days later. In both statements, Alyssa told police what she heard the night of the murder. Ms. Hall's attorney objected on the basis of hearsay. The trial judge agreed that neither recorded statement would be admitted, but he did not want to "deprive the State of [its] only witness." The compromise was that Alyssa would testify in-person but via a video feed to prevent her from "freez[ing] up in front of the jury," and her prior statements would not be played.

Before Alyssa began testifying, the court explained to the jury that she would "be testifying via closed circuit so that she is not in front of . . . the defendant when

---

1. The Georgia legislature substantially amended the statute in 2014. See 2014 Ga. Laws 512.

2. Technicians could also be present to operate the television equipment, as could "any person whose presence, in the opinion of the court, contributes to the well-being of the child." Ga. Code Ann. § 17-8-55(d).

she testifies." The court took a 15-minute recess. When the jury reentered the courtroom, the judge told them that "we're going to give the IT department the lunch hour to work out some technical difficulties," and another witness testified. The jury then left the courtroom for an hourlong lunch. When the jurors returned, the court explained:

> Ladies and gentlemen, there's a provision under Georgia law that allows a child witness like Alyssa in circumstances like these to be questioned outside the presence of the audience and the jurors and defendant. So what we're going to do is [the prosecutor, Ms. Hall's trial attorney], and I, and Alyssa, will [be] going to go into my conference room in the back, and you will be viewing and listening to her testimony through a closed-circuit video connection to this screen. So we're going to adjourn to my chambers, and you'll be hearing from Alyssa. . . .

Again, this arrangement did not allow communication between Ms. Hall and her lawyer.

Alyssa testified on direct that she was watching television when she heard her mother and stepfather "talking real loud" in the kitchen. She ran to her upstairs bedroom and heard Ms. Hall yell at her to stay there. Some minutes later, Alyssa heard her stepfather say, "Put the gun down," and then, "Michelle, don't do this." She then heard gunshots. Ms. Hall's attorney cross-examined without any ability to communicate with his client, the witness's mother.

Matters got worse. The courtroom lost the audio feed from the judge's conference room several times. The judge described the situation to the jury as an "electronic fiasco" and took a recess for court personnel to try to fix the problem. When Alyssa's testimony ended, Ms. Hall's attorney returned to the courtroom. He found Ms. Hall "in tears" because "she couldn't hear half the audio."

In addition to Alyssa's testimony, the jury also heard the audio recording of the 911 call from Ms. Hall and watched the video recording of Ms. Hall's statements to the police. In the recordings, Ms. Hall first said that her husband had shot at her and then shot himself. In a later statement, she told the police that her husband was fatally shot when the gun accidentally discharged as they struggled and as she tried to keep him from killing her and then himself.

Despite defense counsel's efforts, the trial judge found that defense counsel's cross-examination of Alyssa opened the door for admitting the audio-recorded statement she had given to the police. This audio recording was played before the jury, for the stated purpose of bolstering Alyssa's credibility.

The jury convicted Ms. Hall of malice murder, felony murder, and aggravated assault. Ms. Hall's direct appeal brief (signed by the same lawyer who represented her at trial) did not raise a claim based on the loss of her right to communicate with her lawyer during the testimony of the only witness to the shooting.

## B. State Habeas

Ms. Hall's state habeas petition asserted that both her trial counsel and appellate counsel were ineffective. The trial court held an evidentiary hearing. Both Ms. Hall and her defense counsel testified that Ms. Hall had actively helped her attorney examine witnesses during the trial, except during Alyssa's testimony. Ms. Hall's assistance extended to proposing specific questions that her lawyer used to examine witnesses at trial. Ms. Hall told the court that had she been able to communicate

with her lawyer when Alyssa testified, she would have provided him specific information about Alyssa to guide his cross-examination and suggested specific questions for him to ask. Ms. Hall confirmed that she was told that Alyssa would testify outside her presence, but she was not asked whether she agreed. Ms. Hall testified that she did not know until moments before Alyssa testified that she would be unable to communicate with her lawyer during Alyssa's testimony. Ms. Hall's lawyer testified that the specific arrangement of his separation from Ms. Hall without a way to communicate "caught [him] ... by surprise." Although he had accepted having Alyssa testify through the video feed, he "did not advocate for" it, and it "wasn't [his] strategy." He agreed to avoid the admission of Alyssa's recorded statements to the police. He did not know of or agree to the inability to communicate with his client during the witness's testimony.

The state habeas trial court found that "[t]here is no question in this case ... that [Ms. Hall] did nothing to waive her right to consult with counsel during her daughter's testimony." The court ordered a new trial, holding that Ms. Hall's constitutional rights were violated when she was prevented from consulting with her attorney during Alyssa's testimony, confronting Alyssa face-to-face, and attending pretrial conferences at which the attorneys and the judge discussed the procedure for Alyssa's testimony.

The Georgia Supreme Court reversed. *Seabolt v. Hall*, 292 Ga. 311, 737 S.E.2d 314 (2013). The court held that Ms. Hall was not prejudiced by her appellate counsel's errors because, even if he had raised these issues, including the inability to communicate with counsel, and a new trial had been granted, Ms. Hall had not shown that the trial would have ended differently. *Id.* at 317–18.

## C.  Federal Habeas

Ms. Hall filed her habeas petition in federal court under 28 U.S.C. § 2254, claiming that her appellate attorney was ineffective in failing to seek a new trial based on the trial judge holding pretrial conferences outside her presence and using closed-circuit television to "prevent[ ] [her] from confronting the witness or communicating with trial counsel during the testimony of the witness, including on cross examination."

The habeas petition was assigned to a magistrate judge, who recommended granting Ms. Hall's claim of ineffective assistance of appellate counsel. The magistrate judge first found that the Georgia Supreme Court misapplied *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in requiring Ms. Hall to establish prejudice for her ineffective-assistance claim not only by showing that the omitted claim had a reasonable probability of success on appeal, but also that the claim would have a reasonable probability of success at the trial. Unlike the Georgia Supreme Court, the magistrate judge applied Supreme Court precedent to conclude that Ms. Hall had shown deficient and prejudicial performance by appellate counsel.

The district court agreed that the Georgia Supreme Court had "misapplied" *Strickland* but rejected the conclusion that appellate counsel's performance prejudiced Ms. Hall. The problem was waiver in the trial court. The district court noted that Georgia law allows defendants to waive fundamental rights by acquiescence. The state trial judge had announced, on the record and in the presence of Ms. Hall and her counsel, that Alyssa would testify remotely. Ms. Hall remained silent when these statements were made. Counsel did not object. The court found that this si-

lence amounted to waiver of Ms. Hall's fundamental rights, including her right to communicate with her lawyer during Alyssa's testimony. The court held that the trial waiver of the claims meant that Ms. Hall did not have viable claims to urge on appeal, so her appellate lawyer's failure to raise them was not deficient or prejudicial. The district court granted a certificate of appealability "with respect to Petitioner's claim of ineffective assistance of appellate counsel." This appeal followed.

## II. THE STANDARD OF REVIEW

Ms. Hall's habeas petition challenges a state conviction, so our standard of review is governed by 28 U.S.C. § 2254. The Georgia Supreme Court denied Ms. Hall's ineffective-assistance claim on *Strickland*'s prejudice prong. *Hall*, 737 S.E.2d at 317–18. Because the prejudice prong "was adjudicated on the merits in State court proceedings," we must ask if the state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A state-court decision is "contrary to" clearly established Supreme Court precedent either "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 1519–20, 146 L.Ed.2d 389 (2000). We consider "what arguments or theories supported, or . . . could have supported, the state court's decision," and "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior deci-

sion of [the Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101, 131 S.Ct. at 786 (quotation marks omitted). "[T]he state court's ruling on the claim being presented in federal court [must be] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103, 131 S.Ct. at 786–87.

The Georgia Supreme Court held that Ms. Hall was not prejudiced by her appellate lawyer's performance because she did not show a reasonable probability of a different outcome *at trial*. *Hall*, 737 S.E.2d at 317 ("[Ms. Hall] must establish a reasonable probability that the error would have been found not harmless at trial." (quotation marks omitted)). Ms. Hall argues that this misapplied the clearly established Supreme Court precedent set in *Strickland* and years of subsequent cases. That precedent required Ms. Hall to show a reasonable probability of a different outcome *on appeal*, not at trial. The State responds that the Supreme Court has never decided whether prejudice for an appellate ineffective-assistance claim depends on the outcome of the trial, the appeal, or both. The State is incorrect.

In *Smith v. Robbins*, 528 U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000), the Supreme Court set out the test for ineffective assistance of appellate counsel. It is a slight variation on *Strickland*. Under *Robbins*, the defendant "must first show that his counsel was objectively unreasonable in failing to find arguable issues to appeal." *Id.* at 285, 120 S.Ct. at 764 (citation omitted). The defendant must then show "a

reasonable probability that, but for his counsel's unreasonable failure ... he would have prevailed *on his appeal*." *Id.* (emphasis added). *Robbins* makes clear that a defendant is not required to show a reasonable probability of a different outcome at trial had it been conducted without the constitutional infirmity. This was the clearly established law as determined by the United States Supreme Court when the Georgia Supreme Court ruled on Ms. Hall's habeas petition. *See Williams*, 529 U.S. at 412, 120 S.Ct. at 1523.

The Georgia Supreme Court identified prior Georgia cases as the basis for the ineffective-assistance-of-appellate-counsel standard it applied. The test was first announced in *Griffin v. Terry*, 291 Ga. 326, 729 S.E.2d 334 (2012). Although *Griffin* involved an appellate ineffective-assistance claim, the court based the standard it articulated on cases involving ineffective assistance by trial counsel who failed to raise structural errors at trial. *Id.* at 337 (citing *Reid v. State*, 286 Ga. 484, 690 S.E.2d 177 (2010)). These cases hold that prejudice generally cannot be presumed when an ineffective-trial-counsel claim depends on trial counsel's failure to raise a structural error. The reason is because trial ineffective-assistance claims turn on the effect the attorney's performance had on the outcome of the trial, not the appeal. *Reid*, 690 S.E.2d at 181 (citing *Purvis v. Crosby*, 451 F.3d 734, 740–41 (11th Cir. 2006)). These cases do not involve ineffective assistance by appellate attorneys when, for example, they fail to raise structural errors on appeal reasonably likely to carry a presumption of prejudice. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In fact, the *Griffin* court stated its view that the "fundamental purpose of Sixth Amendment ineffectiveness claims" is "to ensure a fair trial and a just result," 729 S.E.2d at 338 (alterations omitted) (quotation marks omitted), without taking into account the constitutional guarantee that a criminal defendant has the right to effective representation both at trial and on appeal, *Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

In *Griffin* and in the Georgia Supreme Court's decision here, the rule announced was contrary to the Supreme Court's determination in *Robbins* that the prejudice suffered from deficient performance by appellate counsel does not concern the outcome of the trial. It is the effect appellate counsel's deficient performance had on the appeal that matters. *Robbins*, 528 U.S. at 285, 120 S.Ct. at 764. We conclude that fairminded jurists could not disagree that the Georgia Supreme Court's test for an appellate ineffective-assistance claim is contrary to Supreme Court precedent. Our review of the prejudice prong of *Strickland* and *Robbins* is de novo. *See McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009) ("Where we have determined that a state court decision is an unreasonable application of federal law under 28 U.S.C. § 2254(d), we are unconstrained by § 2254's deference and must undertake a *de novo* review of the record."). Because the Georgia Supreme Court did not rule on the performance prong, our review of that issue is *de novo* as well. *Porter v. McCollum*, 558 U.S. 30, 39, 130 S.Ct. 447, 452, 175 L.Ed.2d 398 (2009) (per curiam).

## III. DISCUSSION

### A. The Legal Standard

When a habeas petitioner claims that her lawyer was ineffective, we ask (1) if the lawyer's performance was deficient and (2) if this deficiency prejudiced the defendant. *See Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. "The petitioner bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a

*Strickland* claim, and both prongs must be proved to prevail." *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001).

To prove deficiency, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064. This standard is "highly deferential" and requires "a strong presumption" of adequacy. *Id.* at 689, 104 S.Ct. at 2065. We must avoid "the distorting effects of hindsight" and "evaluate the conduct from counsel's perspective at the time." *Id.* "The same standard applies whether we are examining the performance of counsel at the trial or appellate level." *Eagle v. Linahan*, 279 F.3d 926, 938 (11th Cir. 2001). The law on ineffective assistance on appeal is clear that the "attorney is not required ... to raise every non-frivolous issue on appeal." *Brown v. United States*, 720 F.3d 1316, 1335 (11th Cir. 2013). But the attorney *is* expected to "select[ ] the most promising issues for review." *Jones v. Barnes*, 463 U.S. 745, 752, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983). And "[w]here ... appellate counsel fails to raise a claim on appeal that is so obviously valid that any competent lawyer would have raised it, no further evidence is needed to determine whether counsel was ineffective." *Eagle*, 279 F.3d at 943.

To prove prejudice, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "To determine whether the failure to raise a claim on appeal resulted in prejudice, we review the merits of the omitted claim. If we conclude that the omitted claim would have had a reasonable probability of success, then counsel's performance was necessarily prejudicial because it affected the outcome of the appeal." *Eagle*, 279 F.3d at 943 (citation omitted). This inquiry "is not wholly dissimilar from the inquiry used to determine whether counsel performed deficiently in the first place; specifically, both may be satisfied if the defendant shows nonfrivolous grounds for appeal." *Roe v. Flores-Ortega*, 528 U.S. 470, 486, 120 S.Ct. 1029, 1039, 145 L.Ed.2d 985 (2000).

## B. Waiver

■ We turn to the merits of Ms. Hall's claim. Our analysis begins by asking whether Ms. Hall waived the claim she says her lawyer should have appealed. If the record shows that the claim was waived at trial, then Ms. Hall's lawyer had nothing to raise on appeal, and the appeal did not have a reasonable probability of success. The result would be that Ms. Hall's lawyer neither performed deficiently nor caused her to suffer prejudice. But if Ms. Hall did not waive her rights at trial, then we must "review the merits of the omitted claim" on appeal. *Eagle*, 279 F.3d at 943.

Waiver requires the "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *Ward v. State*, 288 Ga. 641, 706 S.E.2d 430, 435 (2011). The record shows that Ms. Hall did not waive the right to communicate with her lawyer when Alyssa testified. Although the trial court informed Ms. Hall that Alyssa would testify outside her presence, the judge never advised Ms. Hall or her lawyer that they would be unable to communicate during the testimony. For all Ms. Hall knew from the trial court's announcement, her lawyer would stay in the courtroom with her and examine Alyssa through the video feed, or, if they were apart, they would be able to exchange messages during Alyssa's

testimony. Nor did defense counsel have any reason to expect that he and his client would be unable to communicate during Alyssa's testimony. To the contrary, the statute the trial court (erroneously) relied on to permit the testimony through the video feed required the defendant to have some means of conferring with her attorney, even though they would be in different rooms. The statute stated that "[t]he defendant shall be allowed to communicate with the persons in the room where the child is testifying by any appropriate electronic method." Ga. Code Ann. § 17-8-55(f). But the trial court did not follow this procedure.

The undisputed evidence from the state habeas hearing confirms this. Ms. Hall testified at the hearing that she first learned that Alyssa would testify remotely "in court minutes before" the testimony began. She further specified that she "didn't even hear it from" her lawyer. "[I]mmediately thereafter, the judge and [her] attorney left to go into the other room." She testified that she was never "asked whether [she] would consent to this method of testifying."

Ms. Hall's lawyer similarly testified that he did not see or speak to Ms. Hall between the trial judge's announcement that Alyssa was about to testify by closed-circuit television and the moment he came back from Alyssa's testimony to find Ms. Hall "in tears because she, number one, didn't get to see her ... daughter, and she didn't communicate with me." He admitted that "[i]t didn't even dawn on me that Michelle wasn't able to write me a note or communicate with me.... I didn't even think about that" before the testimony began. If her own lawyer did not know that Ms. Hall would be unable to communicate with him during Alyssa's testimony, he was not equipped to waive her rights, expressly or otherwise. And if her lawyer did

not know, then certainly Ms. Hall cannot be presumed to have known.

The record shows no legal or factual basis to find the knowledge or intent required for waiver. The transcript of the trial contains nothing suggesting that Ms. Hall knowingly and intelligently waived her right to communicate with her lawyer during Alyssa's testimony. And Ms. Hall's and her lawyer's testimony at the state habeas hearing confirm that they did not realize they would be unable to communicate with each other until moments before the testimony began.

## C. The Merits of the Claim Not Raised on Appeal

Ms. Hall argues that had her direct appeal challenged the constitutionality of her inability to communicate with her trial attorney during Alyssa's testimony, the appeal had a reasonable probability of success, making the failure to raise the claim deficient and prejudicial. We agree.

### 1. The Constitutional Error

◼ "One of the defendant's primary advantages of being present at the trial [is] his ability to communicate with counsel." *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). The Supreme Court has "recognize[d] that the role of counsel is important precisely because ordinarily a defendant is ill-equipped to understand and deal with the trial process without a lawyer's guidance," and "a defendant in a criminal case must often consult with his attorney during the trial." *Geders v. United States*, 425 U.S. 80, 88, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592 (1976). An order prohibiting a defendant from consulting with his attorney even during an overnight recess violates the defendant's right to counsel. *Id.* It is also unconstitutional to administer antipsychotic medication to a defendant during trial if

it will impact "the substance of [the defendant's] communication with counsel." *Riggins v. Nevada*, 504 U.S. 127, 137, 112 S.Ct. 1810, 1816, 118 L.Ed.2d 479 (1992); *cf. id.* at 144, 112 S.Ct. at 1820 (Kennedy, J., concurring) ("We have held that a defendant's right to the effective assistance of counsel is impaired when he cannot cooperate in an active manner with his lawyer. The defendant must be able to provide needed information to his lawyer and to participate in the making of decisions on his own behalf." (citations omitted)). Indeed, with limited exceptions inapplicable here, a defendant has a "right to unrestricted access to his lawyer for advice on a variety of trial-related matters." *Perry v. Leeke*, 488 U.S. 272, 284, 109 S.Ct. 594, 602, 102 L.Ed.2d 624 (1989).

*United States v. Miguel*, 111 F.3d 666 (9th Cir. 1997), illustrates these principles in a case similar to Ms. Hall's. The defendant, Percy Miguel, was convicted of abusive sexual contact. The victim, an 11-year-old boy, gave deposition testimony by videotape outside Miguel's presence. *Id.* at 669. Miguel watched the deposition from another room via closed-circuit television. *Id.* Defense counsel asked the district court for leave to communicate electronically with Miguel during the deposition, but the court rejected the request because counsel could consult with Miguel during the deposition breaks. Miguel had two attorneys representing him at trial. Both sat in the room where the deposition took place. Only one conducted the cross-examination. *Id.* The other attorney was able to be with Miguel in the other room as he watched the deposition, to consult with him, and to convey any messages to the attorney examining the witness. *Id.* at 671. On appeal, Miguel did not argue that he wanted to speak with the attorney conducting the cross-examination. *Id.*

The Ninth Circuit held that the procedure did not violate Miguel's right to counsel. "The only thing [Miguel] was prevented from doing was communicating with one of his two counsel while that counsel was questioning the witness." *Id.* at 672. The court emphasized, however, that if only one attorney had represented Miguel, then "Miguel's inability to communicate contemporaneously with his counsel or to initiate a break in the deposition for purposes of conferring with counsel would have raised extremely serious Sixth Amendment problems." *Id.* After all, "Miguel cannot be said to have had unrestricted access [to counsel] if he lacked any means of initiating communication with counsel during cross-examination of the government's crucial witness." *Id.* at 673.

The measures taken to allow the defendant and counsel to communicate during the witness's examination in *Miguel* made the closed-circuit-television procedure constitutionally acceptable. Miguel had unfettered access to, and could confer with, one of the two lawyers representing him while the other lawyer examined the witness in another room. Ms. Hall, by contrast, had one attorney. She could not communicate with that attorney when he examined the State's most important witness, the only witness to the murder. Ms. Hall's case is the hypothetical scenario the *Miguel* court imagined: a defendant unable to communicate with her attorney as the trial proceeds, much less reaches a critical phase. *See also Moore v. Purkett*, 275 F.3d 685, 688–89 (8th Cir. 2001) (granting habeas relief under 28 U.S.C. § 2254(d) because the trial judge's order that a defendant with limited literacy had to communicate with his attorney only in writing violated the defendant's right to counsel). We conclude that these facts raise "extremely serious Sixth Amendment problems." *Miguel*, 111 F.3d at 672.

## 2. Presumed Prejudice

■ The denial of counsel at a critical stage of the proceedings is a structural error that would have triggered presumed prejudice had it been raised on direct review. "The [Supreme] Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Cronic*, 466 U.S. at 659 n.25, 104 S.Ct. at 2047 (citing *Geders*, 425 U.S. 80, 96 S.Ct. 1330). And "[c]ircumstances ... may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659–60, 104 S.Ct. at 2047. These types of errors so "affect[ ] the framework within which the trial proceeds" that they prevent the trial "from reliably serv[ing] its function as a vehicle for determination of guilt or innocence." *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (quotation marks omitted). "The question is not whether counsel in those circumstances will perform less well than he otherwise would, but whether the circumstances are likely to result in such poor performance that an inquiry into its effects would not be worth the time." *Wright v. Van Patten*, 552 U.S. 120, 125, 128 S.Ct. 743, 746, 169 L.Ed.2d 583 (2008) (per curiam); *see also Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067 ("Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost.").

Ms. Hall's inability to communicate with her attorney during Alyssa's cross-examination, a critical stage of the trial, under the unusual circumstances present here, is a structural error reasonably likely to have triggered presumed prejudice and succeeded on direct appeal. *Geders*, 425 U.S. at 91, 96 S.Ct. at 1337; *Cronic*, 466 U.S. at 659–60, 104 S.Ct. at 2047. Alyssa was difficult to cross-examine, even under better circumstances. She was a child witness, who hid in her bedroom and heard but did not see her mother shoot her stepfather to death. She testified about these events a year after they took place. Defense counsel faced the additional challenge of having to cross-examine Alyssa without opening the door to having the statements she made to the police admitted under the prior-consistent-statement exception to the hearsay rule. Ms. Hall's attorney testified that he consented to the closed-circuit-television procedure precisely to avoid having the recorded statements played before the jury.

In this situation, Ms. Hall's attorney suddenly and unexpectedly found himself without the ability to communicate with his client. Throughout the trial, Ms. Hall's attorney had relied on her to help guide his examination and pose questions, some which he asked "verbatim." He testified that Alyssa's cross-examination suffered because "[f]or every other witness, [Ms. Hall] was there writing to me, writing notes." Georgia law ensured that Ms. Hall could still speak with her attorney despite the video feed, so Ms. Hall's attorney was understandably "caught ... by surprise" when it turned out that he had no way to communicate with her.

The clear and convincing evidence shows that Ms. Hall was instrumental in helping her attorney examine witnesses throughout the trial. But at the moment her attorney needed her help the most, it was unavailable, in circumstances resulting from the trial court's erroneous application of an inapplicable statute. *See* Ga. Code Ann. § 17-8-55(f) (2009). Ms. Hall's absence

transformed a surmountable challenge into a virtual impossibility. Attorney-client communication during cross-examination allows "tactical decisions to be made and strategies to be reviewed." *See Geders*, 425 U.S. at 88, 96 S.Ct. at 1335. "The lawyer may need to obtain from his client information made relevant by the ... testimony, or he may need to pursue inquiry along lines not fully explored earlier." *See id.*

To make it worse, the trial judge found that counsel's cross-examination, crippled by counsel's inability to communicate with Ms. Hall, opened the door for admitting the audio recording of Alyssa's prior statement to the police. *See Hall v. State*, 287 Ga. 755, 699 S.E.2d 321, 324–25 (2010) (the trial court did not abuse its discretion by admitting the audio-recorded statement.). The Georgia Supreme Court noted that Ms. Hall's trial counsel had "reluctantly agreed to the [video-feed testimony] in order to be certain that the judge did not admit a videotaped interview in lieu of live testimony." *Hall*, 737 S.E.2d at 316 n.1. As we have described, however, that is not the whole story: the deal Ms. Hall's trial attorney thought he had struck when he consented to the video feed was to keep out both the video- and audio-recorded interviews Alyssa gave. The videotaped interview was not admitted, but the audio recording was.

No attorney could have provided effective representation in the face of this unusual combination of obstacles. The error in separating Ms. Hall from her counsel without the ability to communicate was structural. Presumed prejudice resulted. And, as we discuss below, actual prejudice is also present.

We recognize that errors carrying presumed prejudice arise in "a very narrow spectrum of cases." *Stano v. Dugger*, 921 F.2d 1125, 1153 (11th Cir. 1991) (en banc) (quotation marks omitted). The unusual set of facts makes this one of those rare cases. The narrow question is whether, given these facts, a reasonable probability exists that the structural-error claim would have succeeded on direct appeal. The record shows a reasonable probability that asserting the claim would have secured a new trial for Ms. Hall.

### 3. Actual Prejudice

The result is the same if we require Ms. Hall to show actual rather than presumed prejudice. *See Hall*, 737 S.E.2d at 317. Although the Georgia Supreme Court found no prejudice, the standard of review is *de novo*, so deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241, *et seq.*, does not apply. *Panetti v. Quarterman*, 551 U.S. 930, 953, 127 S.Ct. 2842, 2858, 168 L.Ed.2d 662 (2007) (when "the requirement set forth in § 2254(d)(1) is satisfied," "[a] federal court must ... resolve the claim without the deference AEDPA otherwise requires."). Our review is based on "the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011). The state habeas trial court made findings of fact and conclusions of law, but its decision was overturned by the Georgia Supreme Court, which reviewed the record and made findings and conclusions of its own. To the extent the Georgia Supreme Court's factual findings are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), there is clear and convincing record evidence rebutting the presumption. *Schriro v. Landrigan*, 550 U.S. 465, 473–74, 127 S.Ct. 1933, 1939–40, 167 L.Ed.2d 836 (2007).

Ms. Hall's separation from her counsel and inability to communicate with him as he framed and asked the questions for Alyssa's cross-examination prevented

him from doing so effectively. The Georgia Supreme Court found that had Ms. Hall been able to speak with her attorney, she would have told him that Alyssa was not afraid of her, that her ex-husband (Alyssa's biological father) coerced Alyssa's testimony, and that Alyssa had written a letter supporting her mother's information. *Hall*, 737 S.E.2d at 317. The court reasoned that her trial attorney already knew that information when he cross-examined Alyssa, and so Ms. Hall did not suffer prejudice. It is no answer to say that Ms. Hall had previously told her attorney the specific information she later identified as important to refuting what Alyssa said on direct. The record precludes the implicit finding that in the crucible of cross-examination, under the circumstances counsel faced, he would have recalled that precise information in time to ask the right questions using the information. Clear and convincing evidence in the record undercuts and precludes finding that no prejudice resulted.

If Ms. Hall's attorney could have communicated with his client in the circumstances of the trial, there is "a reasonable probability that the outcome of the trial would have been more favorable." *See id.* (quotation marks omitted). The attorney testified that "[f]or every other witness, [Ms. Hall] was there writing to me, writing notes." This assistance would have been exceptionally helpful during Alyssa's testimony. Alyssa, Ms. Hall's daughter, testified about what she allegedly heard her mother do and say the night of the shooting. Ms. Hall could have offered unique and invaluable insight and advice into Alyssa's demeanor and testimony. And just as Ms. Hall did with other witnesses, she could have advised her lawyer on how best to address and respond to her daughter's adverse testimony. Effective cross-examination may have left the jury less inclined to credit Alyssa's inculpatory testimony,

including, for example, her statements that she heard her stepfather tell her mother to "put the gun down" and "Michelle, don't do this," followed by gunshots.

We conclude that even if Ms. Hall had to show actual prejudice at trial to succeed on her direct appeal, an effective appellate attorney had a reasonable probability of making that showing.

## D. Deficient Performance and Prejudice

That Ms. Hall's lawyer failed to raise the claim that she could not communicate with her trial counsel during a critical part of the trial tells us what we need to know for *Strickland* and *Robbins* purposes. For *Strickland*'s performance prong, "[w]here, as here, appellate counsel fails to raise a claim on appeal that is so obviously valid that any competent lawyer would have raised it, no further evidence is needed to determine whether counsel was ineffective for not having done so." *Eagle*, 279 F.3d at 943. "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, —— U.S. ——, 134 S.Ct. 1081, 1089, 188 L.Ed.2d 1 (2014). "[N]o conceivable reason that [the lawyer] might have proffered would have made [his] failure to pursue the claim reasonable. [His] failure to raise it, standing alone, establishes [his] ineffectiveness." *Eagle*, 279 F.3d at 943; *see also Overstreet v. Warden*, 811 F.3d 1283, 1287-88 (11th Cir. 2016) (a defendant's "appellate representation was undeniably ineffective" because "had [] appellate counsel raised" a state-law claim based on a Georgia Supreme Court case decided shortly before the defendant's direct appeal, then "absent a departure from precedent, [his]

kidnapping convictions would have been reversed.").

For the prejudice prong, the record also shows that "the omitted claim would have had a reasonable probability of success" on appeal. *Eagle*, 279 F.3d at 943. This makes counsel's performance "necessarily prejudicial because it affected the outcome of the appeal." *Id.* If Ms. Hall had raised the claim on direct appeal, "the [state appellate] court would, in all probability, have opted to grant a new trial. There can be no doubt, then, that counsel's decision to omit the [ ] claim from [his] brief undermines confidence in the outcome of [Ms. Hall's] direct appeal sufficient to satisfy the prejudice prong of *Strickland*." *Id.*

## IV. CONCLUSION

Ms. Hall's appellate lawyer was ineffective. We therefore reverse the district court's denial of habeas corpus relief and remand with directions that the district court order the State to grant Ms. Hall a new direct appeal.

### REVERSED AND REMANDED.

1. The Court expressed its prejudice holding as follows:

   > Thus, to show actual prejudice to [her] appeal, [Hall] must demonstrate that [her] absence from the [examination of Alyssa] would have been reversible error without the benefit of presumed prejudice. To do so, [she] must establish a reasonable probability that the error would have been found not harmless at trial, i.e., a "reasonable probability that the outcome would have been more favorable if counsel had objected to her absence during the [examination of Alyssa]."

   *Seabolt v. Hall*, 292 Ga. 311, 737 S.E.2d 314, 317 (2013) (quoting *Griffin v. Terry*, 291 Ga. 326, 729 S.E.2d 334, 337 (2012) (internal citations omitted)). In support of its holding, the Court cited *Bridges v. State*, 286 Ga. 535, 690 S.E.2d 136 (2010), in which the Court applied *Strickland*'s actual prejudice test,

TJOFLAT, Circuit Judge, Dissenting:

A claim of ineffective assistance of counsel "is an attack on the fundamental fairness of the proceeding whose result is challenged." *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). The claim in this case is that appellate counsel rendered ineffective assistance under *Strickland* by failing to assert on direct appeal a violation of Hall's right under the Georgia Constitution to be present at a critical stage of her murder trial, which is structural error under Georgia law. *See Griffin v. Terry*, 291 Ga. 326, 729 S.E.2d 334, 336 (2012). The Georgia Supreme Court, on habeas corpus review, assumed that counsel's performance was constitutionally deficient but denied Hall relief because she failed to demonstrate *Strickland* prejudice—a reasonable probability that, had counsel asserted the error, the outcome of her trial would have been different.[1] *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

The majority hold that the Georgia Supreme Court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal Law, as deter-

rather than presumed prejudice, to the same constitutional violation Hall asserted—the denial of the right to be present at a critical stage of the trial. *Id.* at 140.

   > [W]here, as here, a defendant is not challenging his conviction directly based on an alleged violation of the right to be present, but instead raises the issue only indirectly under the aegis of an ineffective assistance of counsel claim, he or she must satisfy both prongs of the *Strickland* test for constitutional ineffective assistance of counsel claims.

   *Id.* (quoting *Peterson v. State*, 284 Ga. 275, 663 S.E.2d 164, 168 (2008)). The Court rejected Bridges' claim finding "the evidence of Bridges' guilt was overwhelming, and there is no reasonable probability that the outcome would have been more favorable if counsel had objected to his absence during the pretrial instructions." *Id.*

mined by the Supreme Court of the United States."[2] 28 U.S.C. § 2254(d)(1). Consequently, Hall is entitled to the writ and an opportunity to present her claim of structural error to the Georgia courts as if she were appealing her convictions in the first instance.[3]

The Georgia Supreme Court's decision runs afoul of § 2254(d)(1), the majority hold, because it misapplied the Supreme Court's decision in *Smith v. Robbins*, 528 U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000), a case that Hall did not cite to the Georgia Supreme Court and the Court did not consider. According to the majority, *Robbins* modifies *Strickland*'s prejudice prong. Where ineffective assistance of appellate counsel is claimed, the prejudice inquiry no longer considers whether the outcome of the trial would have been different but for counsel's neglect; rather, the inquiry is strictly whether the outcome of the appeal would have been different. Because structural error is prejudicial *per se*, the majority conclude that but for counsel's neglect, the Georgia Supreme Court may have vacated Hall's convictions and granted her a new trial.[4]

I dissent because the majority's use of *Robbins* is inapposite. If not, *Robbins* in effect overrules Supreme Court holdings— and our precedents that rely on those holdings—requiring a habeas petitioner to demonstrate actual prejudice in order to prevail on a procedurally defaulted claim. Moreover, the majority's use of *Robbins* changes the prejudice standard for claims of ineffective assistance of appellate counsel brought under 28 U.S.C. § 2255, as well as those brought under § 2254. But putting all of this aside, when Hall presents her claim to the Georgia Supreme Court pursuant to the our mandate to the District Court, she is likely to go away empty handed.

## I.

The majority's use of *Robbins* is inapposite. That case dealt primarily with the question of whether California's modified procedure for filing an *Anders* brief (a "*Wende* brief") was constitutional. *Robbins*, 528 U.S. at 264–84, 120 S.Ct. at 752–63. After affirming the California procedure, the Supreme Court remanded the case, indicating in the process that Robbins might prevail if he could "show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, *he would have prevailed on*

**2.** As we have noted:

> The statutory phrase "clearly established Federal law" refers only to "the holdings, as opposed to the dicta," of the Supreme Court decisions extant at the time of the State court adjudication. *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). A State court decision is "contrary to" a Supreme Court holding "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412–13, 120 S.Ct. at 1523. A State court decision involves an unreasonable application of a Supreme Court holding if the State court correctly identifies the holding but unreasonably .applies it to the facts of the prisoner's case. *Id.* at 407, 120 S.Ct. at 1520.
>
> *Hardy v. Comm'r, Ala. Dept. of Corr.*, 684 F.3d 1066, 1074 (11th Cir. 2012).

**3.** I assume that the District Court on remand will issue a writ of habeas corpus directing the Supreme Court of Georgia to uphold the Superior Court's grant of habeas relief. Whether the Supreme Court, itself, passes on Hall's claim of structural error or tasks the Superior Court with that job will be a matter for the Supreme Court to determine.

**4.** As I point out in Part III, *infra*, it is far from certain that Hall would have received a new trial had her claim of structural error been asserted on direct appeal.

*his appeal." Id.* at 284–86, 120 S.Ct. at 763–64 (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2052) (emphasis added). The majority seize on this language in concluding that, under *Robbins, Strickland* prejudice turns on the probable outcome of the petitioner's direct appeal. This single sentence is not *Robbins'* holding, however. The Court did not evaluate the merits of the claims Robbins wanted to pursue on direct appeal because those claims fell outside the narrow question before the Court, which was whether California's *Anders* brief procedure was constitutional. Consequently, the Court's statement regarding whether "[Robbins] would have prevailed on his appeal" is neither part of the *Robbins* judgment that California's modified *Anders* procedure was constitutionally sound nor is it necessary to that holding. *Robbins,* 528 U.S. at 285, 120 S.Ct. at 764.

More crucially, *Robbins* simply does not address whether a habeas petitioner should demonstrate actual prejudice in prosecuting a procedurally defaulted claim of trial court error for the first time on collateral review. The requirement of actual prejudice induces the petitioner to raise the claim on direct appeal and thereby enhances finality. *Robbins,* according to the majority, eliminates that inducement. As a strategic ploy, the party can now await the result of the direct appeal and, if unsuccessful, repair to the habeas court as a stand in for the appellate court. Obviously, such an arrangement would be intolerable. Saddling a petitioner with a prejudice

burden on collateral review that is greater than the prejudice burden on direct appeal is the means for avoiding it. *See Brecht v. Abrahamson,* 507 U.S. 619, 633, 113 S.Ct. 1710, 1719, 123 L.Ed.2d 353 (1993) (explaining that "[t]he principle that collateral review is different from direct review resounds throughout our habeas jurisprudence"); *Purvis v. Crosby,* 451 F.3d 734, 743 (11th Cir. 2006) (same).

Moreover, as the Supreme Court stated in *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), the standard applicable on direct appeal does not apply on collateral review because "we are entitled to presume [the defendant] stands fairly and finally convicted."[5] 456 U.S. at 164, 102 S.Ct. at 1592. Absent the requirement of actual prejudice, claims of trial court error would receive identical treatment on direct appeal and collateral review, obliterating any attempt to uphold the "presumption of finality and legality [that] attaches to the conviction and sentence" when the direct appeal process ends. *Brecht,* 507 U.S. at 633, 113 S.Ct. at 1719; *see also Frady,* 456 U.S. at 166–68, 102 S.Ct. at 1593–94. If *Robbins* eliminates the requirement that a petitioner must show actual prejudice in order to obtain collateral relief on a claim defaulted on direct appeal, then, by implication at least, it partially overrules long standing Supreme Court precedent, not to mention our own decisions based on that precedent.

In *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), the

---

**5.** In fact, *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), carries this principle forward. The Court noted:

The principles governing ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial. As indicated by the "cause and prejudice" test for overcoming procedural waivers of claims of error, the presumption that a criminal judgment

is final is at its strongest in collateral attacks on that judgment.

*Id.* at 697, 104 S.Ct. at 2070. This means that prejudice must be assessed by the outcome of trial because prejudice for a procedurally defaulted claim of trial court error on direct appeal or motion for a new trial would look to the outcome of trial. Such a method is bolstered by the presumption of finality which the petitioner must overcome on collateral review.

petitioner, Francis, was indicted by a Louisiana grand jury from which blacks had been excluded due to their race. *Id.* at 537–38, 96 S.Ct. at 1709. He failed to object to the grand jury's composition prior to trial and was convicted. *Id.* After his conviction was final and he was denied collateral relief in state court, a federal district court granted his application for a writ of habeas corpus under § 2254. *Id.* The Court of Appeals reversed. *Newman v. Henderson,* 496 F.2d 896, 899 (5th Cir. 1974). Citing the Supreme Court's decision in *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), which involved a defaulted constitutional claim similar to Hall's, the Fifth Circuit held that Francis was not entitled to relief. Although he had shown "cause" for his procedural default, he failed to demonstrate "actual prejudice." *Newman,* 496 F.2d at 898–99. The Supreme Court affirmed:

> [T]he Court of Appeals was correct in holding that the rule of *Davis v. United States* applies with equal force when a federal court is asked in a habeas corpus proceeding to overturn a state-court conviction because of an allegedly unconstitutional grand jury indictment. In a collateral attack upon a conviction that rule requires, contrary to the petitioner's assertion, not only a showing of "cause" for the defendant's failure to challenge the composition of the grand jury before trial, but also a showing of actual prejudice.

*Francis,* 425 U.S. at 542, 96 S.Ct. at 1711.

In *Hollis v. Davis,* we followed *Francis* by requiring petitioners asserting defaulted claims of structural error to show actual prejudice even if those claims would otherwise warrant "automatic reversal" on direct appeal. 941 F.2d 1471, 1479 (11th Cir. 1991).

In *Purvis v. Crosby,* we held that prisoners claiming that trial counsel was ineffective in failing to object to a structural error must prove actual prejudice in order to satisfy *Strickland's* prejudice prong. 451 F.3d 734, 741–42 (11th Cir. 2006). We explained that "[o]ur *Hollis* decision establishes as the law of this circuit that an ineffective assistance of counsel claim based on the failure to object to a structural error at trial requires proof of [actual] prejudice." *Id.* at 742. To hold that the petitioner need not show actual prejudice would render

> the Supreme Court's holding[ ] in ... *Francis* ... pointless. Any defendant who could not make the prejudice showing necessary to have a defaulted claim of structural error considered could bypass that requirement by merely dressing that claim in ineffective assistance garb and asserting that prejudice must be presumed. We are not inclined to believe that the Supreme Court's decision[ ] in ... *Francis* [is] pointless.

*Id.* at 743. Moreover,

> [a]s the Supreme Court has emphasized, "[t]he principle that collateral review is different from direct review resounds throughout our habeas jurisprudence." *Brecht,* 507 U.S. at 633, 113 S.Ct. at 1719. To hold that the presumption of prejudice applies not only when properly preserved structural errors are raised on appeal but also when related ineffective assistance claims are raised in a collateral proceeding would diminish the difference between direct and collateral review. It would undermine the important finality and comity interests that are entitled to respect in a § 2254 proceeding, like this one. That we decline to do.

*Id.*

In sum, it is clear to me that the Georgia Supreme Court's decision was not proscribed by 28 U.S.C. § 2254(d)(1) because *Robbins* did not and would not have estab-

lished federal law so restricting the prejudice inquiry established by longstanding precedent.

## II.

The majority's *Robbins* holding changes the prejudice standard for ineffective-assistance-of-appellate-counsel claims in § 2255 proceedings as well as those brought under § 2254. This is so because the Georgia post-conviction model mirrors the federal model created by § 2255. *See Battles v. Chapman*, 269 Ga. 702, 506 S.E.2d 838, 839 (1998) (adopting the *Strickland* standard for ineffective-assistance-of-counsel claims in Georgia). That today's holding will apply in § 2255 cases exactly it as does in the § 2254 case here becomes obvious when we compare the processing of Hall's case in the Georgia courts with the processing of Hall's hypothetical case in the Eleventh Circuit courts.[6]

In both cases, the trial judge committed structural error in allowing Hall's daughter to testify in Hall's physical absence.[7] In both cases, Hall's appellate lawyer failed to assert the structural error on direct appeal. In both cases, after Hall's convictions are affirmed on appeal, Hall petitions the trial court for habeas corpus relief. Prior to today's decision, in both cases Hall is denied relief because she failed to prove

*Strickland* prejudice. *See Strickland*, 466 U.S. at 697, 104 S.Ct. at 2070. In sum, today's decision will work a sea change in the collateral courts' entertainment of trial court errors appellate counsel failed to assert on direct appeal. The collateral courts will step in and perform as appellate courts would in the first instance.

## III.

What will be the likely outcome when the Georgia courts consider Hall's claim of structural error as if she had presented the claim to the Court on direct appeal?[8] Hall's trial attorney invited the error by agreeing to the challenged arrangement. In Georgia, invited errors are rendered null on appeal. *See, e.g., Barnes v. State*, 269 Ga. 345, 496 S.E.2d 674, 686 (1998) (holding an invited error is not a basis for reversal). The same is true in this Circuit:

> The invited error doctrine "stems from the common sense view that where a party invites the trial court to commit error, he cannot later cry foul on appeal." *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009). Thus, where one party has induced or invited error, we may not invoke the plain error rule to reverse the district court's judgment.

*United States v. Carpenter*, 803 F.3d 1224, 1236 (11th Cir. 2015).

---

6. I establish the parallel by assuming that in the hypothetical federal case Hall's husband was a federal official, thereby bringing this case into the jurisdiction of the federal courts under 18 U.S.C. § 1114.

7. The Georgia Constitution provided the basis for the structural error in Hall's Georgia case. "No person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state." Ga. Const. art. 1, § 1, ¶12. The Georgia Supreme Court interprets this provision to guarantee an accused's presence at all critical stages of the prosecution. *Griffin*, 729 S.E.2d at 336. The U.S. Constitution provided the basis for the structural error

in Hall's hypothetical federal case. "In all criminal prosecutions, the accused shall enjoy ... the Assistance of Counsel for his defense." U.S. Const. amend. VI. The provision is interpreted to mean that the accused is entitled to be present at all critical stages of the prosecution. *United States v. Cronic*, 466 U.S. 648, 657–60, 104 S.Ct. 2039, 2046–47, 80 L.Ed.2d 657 (1984).

8. In the hypothetical § 2255 proceeding, this Court, in reversing the trial court's granting of relief, gave no indication of how it would have ruled had Hall's lawyer asserted the structural error on direct appeal.

That the Georgia Supreme Court would have invoked the invited error doctrine no doubt explains why Hall's lawyer did not assert the structural error on direct appeal. He knew that the assertion would have failed.[9] Consider the farce that would be created if trial counsel, in a case such as Hall's, could for strategic reasons agree to the challenged arrangement and then, if the strategy failed, have the client's conviction set aside on appeal. How would the readers of the Atlanta Journal-Constitution react if the law allowed defense counsel to manipulate trial judges like that?

The invited error doctrine did not preclude Hall from seeking habeas corpus relief on the ground that counsel's trial strategy constituted ineffective assistance. In fact, she presented such a claim to the habeas court. She abandoned it because she could not show *Strickland* prejudice.

9. In that the assertion would have failed, it could be argued that counsel was not ineffective in not asserting the error.